**A. H. STEINBERG, M.D. and R. Vance Fitzgerald, M.D. and Sandra Frank and Waldemar Agrow and Mary Doe, for and on behalf of all persons similarly situated, Plaintiffs,**

v.

**Paul BROWN, Att'y General of Ohio, Defendants, and Harry Friberg, Prosecuting Att'y of Lucas County, Ohio, and Anthony Bosch, Chief of Police, Toledo, and Intervening Defendant Homer Schroeder, M.D.**

No. C 70-289.

United States District Court, N. D. Ohio, W. D.

Dec. 18, 1970.

---

Gerald B. Lackey, Harland M. Britz, Louise ˙ Jacobson, Toledo, Ohio, for plaintiffs.

Wm. J. Lee, Asst. Atty. Gen., Columbus, Ohio, for Paul Brown.

John Hayward, Toledo, Ohio, for Harry Friberg.

Frank Pizza, Toledo, Ohio, for Anthony Bosch.

David J. Young, Columbus, Ohio, for Homer Schroeder.

Before WEICK, Circuit Judge, GREEN and YOUNG, District Judges.

## OPINION

DON J. YOUNG, District Judge.

This is another in a series of cases which have been and are being filed in various courts throughout the United States attacking the constitutionality of state statutes forbidding abortions. This particular action was brought under Title 28 U.S.C. §§ 1331–1343, Title 28 U.S.C. §§ 2201 and 2202, Title 28 U.S.C. §§ 2281 and 2284, and Title 42 U.S.C. § 1983. The plaintiffs seek a declaratory judgment that Ohio's abortion statute, Section 2901.16 Ohio Rev.

Code,[1] is unconstitutional under the First, Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments to the Constitution of the United States. They also seek injunctive relief against the enforcement of the statute. Hence a three judge court was convened to hear and determine the matter.

The plaintiffs claim that each of them represents a class of persons who are affected by the Ohio statute complained of. One plaintiff is a physician specializing in obstetrics and gynecology; one is a psychiatrist; one is a social worker; one is a minister of religion; and the final one is a young woman, married but separated from her husband, the mother of one child born in wedlock, and at the time of commencement of the action early in September, 1970, eight to ten weeks pregnant with another child conceived in wedlock.

The defendants named in the amended complaint are the Governor and Attorney General of the State of Ohio, the Prosecuting Attorney of Lucas County, Ohio, wherein this Division of the District Court sits, and the Chief of Police of the City of Toledo, the county seat of Lucas County.

The amended complaint seeks a declaratory judgment that Section 2901.16 Ohio Rev.Code is in violation of the rights of the plaintiffs under the six amendments to the Constitution listed above and for injunctive relief.

A motion for a temporary restraining order was heard and overruled by the single judge of the Western Division of the Northern District of Ohio, and a motion to intervene as a party defendant on behalf of the unborn child of the plaintiff Mary Doe, and the class of unborn children of the women of the class represented by Mary Doe, filed by Homer Schroeder, M. D. was granted by this single judge.

Dr. Schroeder also filed a motion to be appointed as Guardian ad Litem for the unborn child, and motions for leave to file briefs *amicus curiae* were filed by a group of some forty organizations and individuals supporting the plaintiffs, and by the Ohio Right to Life Society, Inc. supporting the defendants. Various other motions were filed, including motions by all of the defendants except the intervening defendant Schroeder to dismiss the complaint, and a motion of the plaintiff to dismiss the intervening defendant Schroeder.

The motions to dismiss were overruled, as were the motion to appoint a guardian ad litem for the unborn child and children, and the other technical motions. The two principal motions for leave to file briefs *amicus curiae* were granted.

The case was submitted upon the evidence offered at the hearing on the motion for a temporary restraining order, certain stipulations, the deposition of John F. Hillabrand, M. D., the briefs, and arguments of counsel.

The evidence indicated that the plaintiffs Steinberg and Fitzgerald had been consulted by the plaintiff Mary Doe. When Dr. Steinberg examined her on October second, she appeared to be eight to ten weeks pregnant, but he testified that another doctor might think she was twelve to fourteen weeks pregnant. He also testified that she was in normal physical condition, and that her previ-

---

1. Ohio's abortion statute provides:

No person shall prescribe or administer a medicine, drug, or substance, or use an instrument or other means with intent to procure the miscarriage of a woman, unless such miscarriage is necessary to preserve her life, or is advised by two physicians to be necessary for that purpose.

Whoever violates this section, if the woman either miscarries or dies in consequence thereof, shall be imprisoned not less than one nor more than seven years.

This statute or one very similar to it has been in effect since at least 1834. Section 1 of the Act of February 7, 1834, S & C Stat. 440. Wilson v. State, 2 Ohio St. 319 (1853). There have been many prosecutions under it but until the present case, so far as we have been able to ascertain, no one has ever challenged its constitutionality.

ous pregnancy had been normal, with no complications. He further testified that at that stage of her pregnancy, abortion would present less hazard to life than to carry the child to term, but this situation would not continue, as the hazards of abortion increase later in pregnancy.

The plaintiff psychiatrist, Dr. Fitzgerald, testified that Mary Doe had a serious defect in her ability to make judgments about people and situations; that her daydreams influenced her more than the actual facts; that she was moderately depressed and withdrawn; that she was seriously disturbed, and presented gross or serious defects in her ego-functioning; that she could become a child-battering mother; and that she irrationally rejected the alternative to abortion of carrying the child to term and then consenting to adoptive placement. However, he did not predict that she would either die or kill herself if this pregnancy were carried to term, although it would do her grave psychological harm. He stated that the likelihood of great damage coming to the infant from neglect or abuse were high indeed. It was his conclusion that in such states as California or Colorado, Mary Doe could receive therapeutic approval for abortion on psychiatric and medical grounds.

The evidence revealed that Mary Doe was a welfare recipient in Wood County, Ohio, adjacent to Lucas County. She is twenty-one years old.

Both of the plaintiff doctors testified that they believed they would be violating the Ohio abortion statute if they advised the plaintiff Mary Doe to seek an abortion outside the State of Ohio, although it was stipulated in evidence that no physician had ever been prosecuted in Lucas County for a violation of Section 2901.16 Ohio Rev.Code as an aider and abettor on the ground that he counselled or procured an abortion; nor had any minister or social worker. It was also stipulated that no such prosecutions had ever been threatened, nor had any of the plaintiffs ever been warned by any law enforcement authorities.

The only other evidence in the case was the deposition of Dr. Hillabrand offered by the defendants. This concerned the development of unborn children from conception to birth. It also offered statistical evidence that the risk of maternal mortality was far higher from abortions performed even under clinical conditions than from carrying the child until natural childbirth. This testimony is, of course, in square conflict with that of the plaintiff Steinberg, but it is unnecessary for the purposes of this opinion to resolve this conflict, since it involves policy considerations which are properly legislative, rather than judicial, concerns.

This case presents threshold questions of the right to injunctive relief, standing of the plaintiffs to maintain the action, and the doctrine of abstention. These problems have been considered in other similar cases.

■ The question of standing is considered in Roe v. Wade, 314 F.Supp. 1217 (N.D.Texas 1970), and Doe v. Bolton, 319 F.Supp. 1048 (N.D.Georgia 1970). Both cases resolved the question favorably to parties who stood in the positions of the plaintiffs here. We accept the conclusions in these cases, and hold that the plaintiffs herein have proper standing to maintain this action. Cf. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

■ The problem of abstention was considered and abstention denied in the case of Babbitz v. McCann, 310 F.Supp. 293 (E.D.Wis.1970) app. dis. 400 U.S. 1, 91 S.Ct. 12, 27 L.Ed.2d 1 (1970). See also, Doe v. Bolton, supra. There was no proof that prosecution of any of the plaintiffs was commenced or even threatened. Plaintiffs are therefore not entitled to injunctive relief. The prayer for injunction restraining the enforcement of the statute is therefore denied.

This then requires a resolution of the merits of the plaintiffs' request for

declaratory relief, to which we now address ourselves.

The plaintiffs' first contention is that Section 2901.16 Ohio Rev.Code is unconstitutionally vague and indefinite. This same contention has been raised in a number of cases, involving statutes of different states. There are differences in language among all of the various statutes that have been brought before the courts, and by using the same sort of hair-splitting semanticism that the plaintiffs have employed in argument, it would be possible to distinguish the Ohio statute from the others. It does not appear to us, however, that there is sufficient difference in substance among the various statutes involved in other cases to make it desirable to use so narrow and limited an approach to the problem. It seems preferable to take a stand with one group or the other of the divided authorities.

Abortion statutes have been held unconstitutionally vague in the cases of California v. Belous, (1969) 71 Cal.2d 954, 80 Cal.Rptr. 354, 458 P.2d 194, cert. denied, 397 U.S. 915, 90 S.Ct. 920, 25 L.Ed.2d 96 (1970); United States v. Vuitch, 305 F.Supp. 1032 (D.D.C.1969), prob. juris. noted, 397 U.S. 1061, 90 S.Ct. 1497, 25 L.Ed.2d 683 (1970); and Roe v. Wade, 314 F.Supp. 1217 (N.D. Texas 1970). Contrary holdings are found in Babbitz v. McCann, *supra* and Rosen v. Louisiana State Board of Medical Examiners, 318 F.Supp. 1217 (E.D. La. New Orleans Div. 1970). The question was raised, but not decided, in Doe v. Bolton, *supra*.

■ We believe that the better reasoning is found in those cases which hold that there is no unconstitutional vagueness in the abortion statutes which they consider. It appears to us that the vagueness which disturbs the plaintiffs herein results from their own strained construction of the language used, coupled with the modern notion among law review writers that anything that is not couched in numerous paragraphs of fine-spun legal terminology is too imprecise to support a criminal conviction. See Davis v. Toledo Metropolitan Housing Authority, 311 F.Supp. 795, 797 (N.D.Ohio W.D.1970). The words of the Ohio statute, taken in their ordinary meaning, have over a long period of years proved entirely adequate to inform the public, including both lay and professional people, of what is forbidden. The problem of the plaintiffs is not that they do not understand, but that basically they do not accept, its proscription.

The second contention of the plaintiffs and those *amicus curiae* who support their position is that the Ohio abortion statute deprives them of the right of privacy which is supposedly protected by several amendments to the Constitution of the United States. The arguments and authorities cited go on at inordinate length, but when the meringue is sluiced away, they come down to the contention that the decision of the Supreme Court in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), which recognized the right of marital privacy by voiding a statute preventing dissemination of contraceptive information and devices, must by extension protect the right to destroy the product of conception after it has taken place.

■ Again the authorities are divided, some courts accepting the plaintiffs' view, and others refusing to do so. The majority of this Court do not accept the plaintiffs' contentions as constitutionally valid, but believes that the cases which do accept them have not been based on a proper legal or factual understanding. The plaintiffs' contentions seek to extend far beyond the holding in the *Griswold* case this "right of privacy", which is nowhere expressly mentioned in the Constitution or its amendments, but is only found in the "penumbra" of those articles. Rights, the provision of which is only implied or deduced, must inevitably fall in conflict with the express provisions of the Fifth and Fourteenth Amend-

ments that no person shall be deprived of life without due process of law. The difference between this case and *Griswold* is clearly apparent, for here there is an embryo or fetus incapable of protecting itself. There, the only lives were those of two competent adults.

■ Without going into all of the myriad of cases and texts that deal with various aspects of this problem, the question resolves itself into whether or not the state has a legitimate interest to legislate for the purpose of affording an embryonic or fetal organism an opportunity to survive. We think it has and on balance it is superior to the claimed right of a pregnant woman or anyone else to destroy the fetus except when necessary to preserve her own life.

One of the great puzzles of the law is why its practitioners blithely argue their cases and make their decision in total disregard, if not ignorance, of the laws of nature. Automobile collision cases, for example, are often decided on the basis of facts which are completely impossible under the physical laws of motion and mechanics. So in this area, those decisions which strike down state abortion statutes by equating contraception and abortion pay no attention to the facts of biology.

The evidence offered by the defendants in this case shows clearly, conclusively, and in detail that neither the human ovum or spermatozoon are alive, or capable of independent life, in the accepted meaning of that word. One dictionary definition of the word "life" is

> that quality or character [that] distinguishes an animal or a plant from inorganic or dead organic bodies and which is especially manifested by metabolism, growth, reproduction and internal powers of adaptation to the environment. Webster's New International Dictionary of the English Language (2nd ed. 1934).

Biologically, when the spermatozoon penetrates and fertilizes the ovum, the result is the creation of a new organism which conforms to the definition of life just given. Although this is a definite beginning, there is no assurance in any particular case as to how long the life thus begun will continue. It may endure only a few hours or days, or it may continue in excess of a century, so far as human life is concerned. In other life forms it may continue for many measurable centuries, or even for an immeasurable and endless period. Thus when a new life comes into being with the union of human egg and sperm cells, it may terminate, or be terminated, at any moment after it commences, and before, at, or after the particular developmental process called "birth" takes place. Such terms as "quick" or "viable", which are frequently encountered in legal discussion, are scientifically imprecise and without recognized medical meaning, and hence irrelevant to the problem here presented. As scientific knowledge of prenatal physiological processes increases, medical intervention will have a greater chance of avoiding premature termination of lives of children, both before and after birth.

■ Thus contraception, which is dealt with in *Griswold*, is concerned with preventing the creation of a new and independent life. The right and power of a man or a woman to determine whether or not to participate in this process of creation is clearly a private and personal one with which the law cannot and should not interfere.

It seems clear, however, that the legal conclusions in *Griswold* as to the rights of individuals to determine without governmental interference whether or not to enter into the processes of procreation cannot be extended to cover those situations wherein, voluntarily or involuntarily, the preliminaries have ended, and a new life has begun. Once human life has commenced, the consti-

tutional protections found in the Fifth and Fourteenth Amendments impose upon the state the duty of safeguarding it.

Obviously, of course, there are limits to the protection which the state can and must extend to human life, but these are clear and well-marked in the law, and have been for centuries, essentially on the basis that "self-preservation is the first law of nature". Thus throughout the development of our law, self-defense has always been recognized as a justification for homicide. Hence the provision in the statute here in question that abortion is noncriminal when it is necessary, or declared by two physicians to be necessary, to preserve the life of the mother. One human life may legally be terminated when doing so is necessary to preserve or protect another or others.

There is authority for the proposition that human life commences at the moment of conception.

> Biologically speaking, the life of a human being begins at the moment of conception in the mother's womb. 42 Am.Jur.2d, Infants § 2 at p. 9 (1968).

> From the viewpoint of the civil law and the law of property, a child *en ventre sa mere* is not only regarded as human being, but as such from the moment of conception * * * which it is in fact. Bonbrest v. Kotz, 65 F.Supp. 138, 140 (D.D.C.1946).

> medical authority has recognized long since that the child is in existence from the moment of conception * * W. Prosser, The Law of Torts, § 56 at 355 (3rd ed. 1964).

In this connection it should be noted that Ohio never did follow Mr. Justice Holmes's opinion in Dietrich v. Inhabitants Northampton, 138 Mass. 14, 52 Am.Rep. 242 (1884), which for more than half a century fouled up the tort law with respect to pre-natal injuries, but is now pretty well abandoned by all courts except those which, once having made a mistake, cannot admit it, but

expect the legislature to rescue the public from the consequences of their error. The courts of Ohio have never hesitated to protect a child merely because it was unborn at the time of injury.

If the law is in accord with science for the purpose of protecting property rights, how can it possibly not be in accord with science for the purpose of protecting life itself, without which no property right has any worth or value whatsoever?

It should perhaps be mentioned that the implication, or sometimes the express statement, found in arguments of persons in the position of the plaintiffs in this case, which equates the necessity of giving birth to a child with the necessity of rearing the child, has no foundation in law or fact. The law may take permanently from its natural parents a child who is neglected by them, and the frequent pusillanimity of courts and social agencies in this regard does not change the legal situation. The statutes of practically all states provide for the voluntary surrender of children. When the statutes are complied with, the child is legally and practically as dead to its natural parents as if it had been aborted, stillborn, or had died in infancy. The validity and effectiveness of surrender statutes have been upheld in every case in which they have been questioned. There is no need for parents to terminate an undesired pregnancy by killing the unborn child physically, when with less risk to themselves its legal death can so easily be procured.

It is our conclusion that Section 2901.16 Ohio Rev.Code is a valid and proper exercise of the power of the state.

█ The plaintiffs' contention that the abortion statute is in violation of the equal protection clause of the Fourteenth Amendment requires little consideration. This statute, § 2901.16 Ohio Rev.Code is clearly non-discriminatory upon its face. There is nothing in the evidence before the Court to

show any official discrimination in the application of the statute, or in commencing prosecutions under it.

■ Assuming, *arguendo*, that the contentions of the plaintiffs that wealthy persons can shop for more complaisant physicians, or can travel to remote places where abortion is legal, while poor people cannot, have a sound basis in fact, the situation is not inherent in the language of the statute. Neither is it caused, nor could it be cured, by either action or inaction on the part of the government, either state or national. The equal protection clause is not designed to prevent that inequality which is often found in life and in nature, nor could any law be framed to do so. So far as this case is concerned, on the evidence adduced, the social and economic conditions alleged by plaintiffs as a basis for their equal protection argument, do not affect any of the actual parties, and hence the classes they represent. In seeking a temporary restraining order the plaintiffs appeared to contend that only the force of the law stood in the way of plaintiff Mary Doe undergoing the abortion she desired, and the other plaintiffs desired her, to have. It was not claimed that her economic or social situation would prevent her from getting an abortion.

We do not find that § 2901.16 Ohio Rev.Code is in any way violative of the equal protection clause of the Fourteenth Amendment.

■ The contention that the Ohio abortion statute contravenes the Eighth Amendment proscription of cruel and unusual punishment is unworthy of serious consideration. It may seem cruel to a hedonist society that "those who dance must pay the piper", but it is hardly unusual, and the language of the amendment is in the conjunctive, not the disjunctive. In the complexities of human life it is not always possible to foretell with exactitude the entire consequences of even the simplest or most innocent action. But if it is known generally that an act has possible consequences that the actor does not desire to incur, he has always the choice between refraining from the act, or taking his chance of incurring the undesirable consequences. There are no other alternatives. This is peculiarly true with respect to the bearing of children. If one gambles and loses, it is neither statute nor constitution that determines the price, or how it shall be paid. The result is not punishment, but merely the *quid pro quo*.

The controversial problems of the plaintiffs should be addressed to the state's legislature and not the courts for solution. The courts ought not to be expected to provide a remedy for all of the ailments afflicting society.

For the foregoing reasons, the plaintiffs are not entitled to a declaratory judgment invalidating Ohio's abortion statute, Section 2901.16 Ohio Rev.Code.

This opinion is adopted as findings of fact and conclusions of law. Judgment will be entered in favor of the defendants dismissing the amended complaint.

BEN C. GREEN, District Judge (dissenting):

I concur in the determination of the majority that plaintiffs herein have proper standing to maintain this action and that this Court should not abstain from the exercise of jurisdiction. However, I cannot agree with the decision on the merits of the declaratory judgment proceeding.

In its present form, the Ohio statute on abortion which emanates from legislation first enacted 136 years ago, provides as follows:

*Ohio Revised Code* § 2901.16 *Attempt to procure abortion*

No person shall prescribe or administer a medicine, drug, or substance, or use an instrument or other means with intent to procure the miscarriage of a woman, unless such miscarriage is necessary to preserve her life, or is advised by two physicians to be necessary for that purpose.

Whoever violates this section, if the woman either miscarries or dies in consequence thereof, shall be imprisoned not less than one nor more than seven years.

Plaintiffs contend that this statute is unconstitutionally vague and indefinite. One of the criteria against which the validity of a criminal statute, such as O.R.C. § 2901.16, must be measured is reflected in the holding of the Supreme Court in Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926), that:

* * * a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. *Id.*, p. 391, 46 S.Ct. p. 127.

The majority opinion passes off the question of vagueness of this statute with the statement that:

It appears to us that the vagueness which disturbs the plaintiffs herein results from their own strained construction of the language used, coupled with the modern notion among law review writers that anything that is not couched in numerous paragraphs of fine-spun legal terminology is too imprecise to support a criminal conviction.

* , * * The words of the Ohio statute, taken in their ordinary meaning, have over a long period of years proved entirely adequate to inform the public, including both lay and professional people, of what is forbidden. The problem of the plaintiffs is not that they do not understand, but that basically they do not accept, its proscription.

It is my opinion that the difficulty with the statute in question is not its failure to be phrased in "numerous paragraphs of fine-spun legal terminology", but rather its attempt to define a medical problem in terms that are not understandable by the medical profession. A continuing complaint of the medical profession is that the laws in general, and judicial decisions, are not responsive to the realities of medical science. It is interesting to note that while the body of the statute condemns the attempt to procure a "miscarriage", the statute is captioned "Attempt to procure abortion." This failure of this statute, and others like it, to observe the medical distinction between abortion and miscarriage has been noted (1 O.Jur.2d, Abortion, § 2; 1 Am.Jur.2d, Abortion, § 1), and it is said that the two terms are used indiscriminately by the courts. 1 O.Jur.2d, Abortion, § 2.

An excellent discussion of the vagueness of the phrase "necessary to preserve" is found in People v. Belous, 71 Cal.2d 954, 80 Cal.Rptr. 354, 458 P.2d 194 (1969), cert. den. 397 U.S. 915, 90 S.Ct. 920, 25 L.Ed.2d 96 (1970), wherein an abortion statute similar to that of Ohio was held unconstitutional. Reiteration of all the considerations reviewed therein which led the court to find the statute unconstitutionally vague is not necessary. However, I should like to set forth what I believe to be a primary example of the vagueness of the Ohio statute: the suicidal patient.

A pregnant woman informs her physician that if her pregnancy goes to term she will take her own life. Is an abortion *necessary to preserve* the life of that patient? The patient will not die from any physiological condition related to her pregnancy. Suicide is an intentional act (although, perhaps, not truly a volitional one), and the patient may not, in fact, carry out her threat. Assuming that the physician has strong and valid reasons to believe that his patient will take her own life, does this statute tell him whether he may legally terminate the pregnancy?

There are other questions created by this statute. How imminent must the threat of death be to warrant an abortion "to preserve life?" If permitting a pregnancy to go to term would clearly shorten the mother's life by a substantial number of years, would a physician be justified in performing an abortion in

accordance with the term "necessary to preserve her life?"

An Ohio court has recently defined a "necessary thing" as follows:

A necessary thing may supply a wide range of wants, from mere convenience to logical completeness. City of Dayton v. Borchers, 13 Ohio Misc. 273, 232 N.E.2d 437, 441, 42 O.O.2d 193, 197 (Ohio Com.Pl.1967)

Such a definition certainly does not advise what is permitted and what is forbidden.

With regard to the assertion that the lessons of time have compensated for the deficiencies of the statute, I do not find that to be the case. I have endeavored to examine all recorded Ohio decisions construing O.R.C. § 2901.16 and the predecessor thereto, and find that not one of the cases I have reviewed construes the statutory phrase "necessary to preserve her life", or the language of similar import in the earlier statutes. (A listing of the said decisions in appended hereto). A study of the Ohio case histories offers little guidance to the physician searching for the meaning of the, language "necessary to preserve her life."

No person may be required at peril of life, liberty, or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the state commands or forbids. Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939). It is my opinion that O.R.C. § 2901.16 is unconstitutionally vague. Cf. Roe v. Wade, 314 F. Supp. 1217 (D.C.N.D.Tex., 1970); United States v. Vuitch, 305 F.Supp. 1032 (D.C.D.C.1969); People v. Belous, supra.

I am also of the opinion that the statute suffers from the constitutional vices of over-breadth and violation of equal protection of the law. Roe v. Wade, supra; People v. Belous, supra. In reaching this conclusion, I find the applicable law to be well stated in People v. Belous, supra, 80 Cal.Rptr. 354, 362, 458 P.2d 194, 202:

Although we may assume that the law was valid when first enacted, the validity of a law in 1850 does not resolve the issue of whether the law is constitutionally valid today. [Citations omitted]

Constitutional concepts are not static. Our United States Supreme Court said, regarding the equal protection clause of the Fourteenth Amendment: "We agree, of course, with Mr. Justice Holmes that the Due Process Clause of the Fourteenth Amendment 'does not enact Mr. Herbert Spencer's Social Statics.' [Citation] Likewise, the Equal Protection Clause is not shackled to the political theory of a particular era. In determining what lines are unconstitutionally discriminatory, we have never been confined to historic notions of equality, any more than we have restricted due process to a fixed catalogue of what was at a given time deemed to be authorized to practice surgery, carried out the limits of fundamental rights. * * *" (Harper v. Virginia State Bd. of Elections (1966) 383 U.S. 663, 669, 86 S. Ct. 1079, 1082, 16 L.Ed.2d 169; see. also, Perez v. Sharp, *supra*, 32 Cal.2d 711, 727, 198 P.2d 17; Galyon v. Municipal Court, 229 Cal.App.2d 667, 671–672, 40 Cal.Rptr. 446, and cases cited therein ["[A] statute valid when enacted may become invalid by change in the conditions to which it is applied."]. See also, Means, *supra*, 14 N.Y.L.F. 411, 514–515.)

Virtually all the cases which have considered this question recognize that when the abortion statutes were enacted the surgical procedure required in an abortion presented a substantial risk of death to the woman involved. It is also recognized that this situation no longer exists with today's medical advances. Protection of the mother from unsafe surgical procedures may well have been in the legislators' minds when they enacted the Ohio statute in 1834. Modern day medicine, however, makes induced miscar-

riage in the first trimester of pregnancy a safer procedure than delivery at full term. See, People v. Belous, supra, 80 Cal.Rptr. 360–361, 458 P.2d 200–201. In many areas the mortality rate from therapeutic abortion is less than that occasioned by childbirth. Note, Abortion Reform: History, Status and Prognosis, 21 Case W.Res.L.Rev. 521, 522–523 (1970).

Under each of the statutes enacted by the Ohio Legislature regulating the right to abortion there was exempted therefrom a classification of pregnant women whose interests were deemed superior to those of the child she was carrying. Having thus recognized that there are pregnant women whose interests rise above all others, the state may not unreasonably restrict the right of pregnant women to be included in such classification.

Viewed in its historical perspective, the Ohio statute could well have been considered as a reasonable measure when it was adopted 136 years ago. At that time the risk of death on the operating table for any surgical procedure was extremely serious, and the state, to protect the interests of its citizens, could reasonably restrict the availability of abortion to those women who faced an equally serious risk of death if the operation was not performed.

When this statute was first enacted, the discipline of psychiatry was unknown in the medical profession. Today, it is recognized that mental illness is, at least, as great a threat to human well-being as is physical illness. We also know that many factors can precipitate a permanent and incurable mental disorder, among them the strain of childbirth or the inability of the mother to cope with the responsibilities of caring for an infant.

In my opinion, the continuance of the sole exception to the abortion statute of the necessity to save life is a refusal to recognize the advance of medical science in its understanding of the mind, and can no longer be considered as representing a reasonable classification. In ef-

fect, this statute says that a woman whose continued physical life is threatened by pregnancy may secure appropriate medical help, but that a woman whose sanity is equally threatened must be condemned to a continuing existence without the human attributes of intellect and reason. I do not believe that our society can condone such a classification as reasonable when, with minimal risk to the physical well-being of the woman, the dire potential psychiatric consequences can be avoided.

Similarly, I have serious reservations regarding the exclusion from the right to abortion of the victims of forcible rape or the minor who is pregnant as the result of an uninvited incestuous relationship. The innocent victim of such a crime did not have the opportunity to refrain from the act which resulted in pregnancy. To suggest that, in the case of such an unfortunate circumstance, pregnancy is a *quid pro quo* or that "those who dance must pay the piper" strikes me an inhumane. I believe that the interests of such women in being relieved from the consequences of the violations of their body should, in a civilized society, be deemed superior to the interests of the unborn child conceived in violence or lust.

I now turn to the contention of plaintiffs' covering the question of the invasion of the right of privacy, and the relationship of the decision of the United States Supreme Court in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), to the validity of the Ohio abortion statute, O.R.C. § 2901.16.

Regarding the application of *Griswold* to the instant case, the majority distinguishes *Griswold* on the basis that the decision, which struck down a state ban on the dissemination of contraceptive information and devices, involved only the interests of two competent adults, whereas in this case "there is an embryo or fetus incapable of protecting itself." In my opinion, such an approach to *Griswold* totally disregards the constitutional doctrine enunciated therein, and looks

merely to the narrow fact issue before the Supreme Court.

The majority opinion states:

Without going into all of the myriad of cases and texts that deal with various aspects of this problem, the question resolves itself into whether or not the state has a legitimate interest to legislate for the purpose of affording an embryonic or fetal organism an opportunity to survive. We think it has and on balance it is superior to the claimed right of a pregnant woman or anyone else to destroy the fetus except when necessary to preserve her own life.

It appears from a further reading of the majority opinion that the basis for their conclusion is a finding that human life exists from the time of conception.

I will not debate the biological or philosophical conclusion of the majority that, from the moment of conception a human life has commenced, although retired United States Supreme Court Justice Tom C. Clark does appear to take issue therewith, Clark, Religion, Morality and Abortion: A Constitutional Appraisal, 2 Loyola Univ. (L.A.) L.Rev. 1, 9–10 (1969). I am, however, more inclined to the view expressed in Doe v. Bolton, 319 F.Supp. 1048, 1055 (D.C.N.D.Ga., filed July 31, 1970) that "once conception takes place and an embryo forms, for better or for worse the woman carries a life form with the potential of independent human existence."

In my opinion, the question of whether once conception occurs life is present is not controlling on the right to abort such existence. I believe that the *Griswold* decision stands for the proposition that the interests of the embryo or foetus must be balanced against the interests of the pregnant woman, and the resolution of the ultimate question of the right to abortion hinges on the balancing of such interests. Under the principles of constitutional law enunciated in *Griswold*, the state bears the burden of demonstrating a compelling interest in restricting the rights of the pregnant wom-

an by the enforcement of statutes limiting the availability of abortion. Accord, Doe v. Bolton, supra; Roe v. Wade, 314 F.Supp. 1217, 1222 (D.C.N.D.Tex., 1970); Babbitz v. McCann, 310 F.Supp. 293, 301 (D.C.E.D.Wis., 1970); United States v. Vuitch, 305 F.Supp. 1032, 1035 (D.C.D.C.1969). Justice Clark, in his analysis of the *Griswold* doctrine, states:

The result of these decisions is the evolution of the concept that there is a zone of individual privacy which is protected by the Constitution. Unless the State has a compelling subordinating interest that outweighs the individual rights of human beings, it may not interfere with a person's marriage, home, children, and day-to-day living habits. This is one of the most fundamental concepts that the Founding Fathers had in mind when they drafted the Constitution. No one will deny that a State has a valid interest in regulating the well-being of its inhabitants, especially when it is dealing with children, who are more susceptible to undesirable influences. We have also seen that a State may not unreasonably interfere with the intimate relations of its inhabitants. When deciding on the constitutional restraints imposed on a State's interference with individual rights, the vital question becomes one of balancing. It must be determined at what point the State is interfering with individuals and at what point it is exercising valid authority by regulating the well-being of children. 2 Loyola Univ. (L.A.) L. Rev. 1, 8.

As previously indicated herein, I do not consider the protection of an embryo in its early stages of existence as a compelling state interest sufficient to justify the sweeping scope of the statute in this modern era. In reaching the conclusion that "once human life has commenced, the constitutional protections found in the Fifth and Fourteenth Amendments impose upon the state the duty of safeguarding it", the majority opinion does not consider the countervailing consideration of the rights of the pregnant wom-

an which are impinged upon by such legislation.

Further, I do not find that the history of this statute, its interpretation by the Ohio courts, and the recognition of rights of unborn children by the Ohio courts, supports the argument that the state has evidenced a compelling interest in the *total* protection of fetal life.

When the Ohio abortion legislation was first enacted, it was part of a six-section statute, 32 v Stat. 20. The first section declared it to be a misdemeanor to administer drugs or use an instrument with the intent to procure the miscarriage of any pregnant woman. The second part of the statute declared it to be a high misdemeanor, subject to imprisonment for seven years, to do the same acts with regard "to any woman, pregnant with *a quick child*", in the case of the death of such child or mother. The third section made it an offense for a physician, or other person, while in a state of intoxication to prescribe any poison, drug or medicine to another person, so as to endanger such latter person's life. The fourth section made it an offense for any physician, or person, to prescribe a drug or composition, the true nature and composition of which was unknown, on the representation that the same was a secret medicine. The fifth and sixth sections were venue and the effective date of the legislation.

It thus seems that the first Ohio abortion law was part of a package intended to regulate the proper practice of the medical profession. It is plain that the more serious offense thereunder was restricted to those instances where the condemned practices were practiced upon a woman pregnant with a *quick child*, that is, a child whose uterine movements could be felt by the mother, and did not apply prior thereto. Wilson v. State, 2 Ohio St. 319 (1853).

The 1834 statute was amended effective April 13, 1867, by the repeal of section two of the original Act and enactment of a substitute therefor, 64 v Stat.

135. That amended statute, in pertinent part, provided:

> \* \* \* that any physican or other person who shall administer, or advise to be administered, to any woman *pregnant with a vitalized embryo, or foetus, at any stage of utero-gestation,* any medicine, drug, or substance whatever, or who shall use or employ \* \* any instrument or other means with intent thereby to destroy such *vitalized embryo, or foetus,* unless the same shall have been necessary to preserve the life of the mother, or shall have been advised by two physicians to be necessary for such purpose, shall, in case of the death of such *vitalized embryo, or foetus,* or mother in consequence thereof, be deemed guilty of a high misdemeanor \* \* \* (emphasis added)

It is argued that this change from the phrase "any woman, pregnant with a quick child" to the phrase "any woman pregnant with a vitalized embryo, or foetus, at any stage of utero-gestation" was:

> \* \* \* in recognition of medical science findings that there was a live developing organism even before the mother was able to feel movement of the child [and that] the Ohio General Assembly [thereby] recognized that the child was alive prior to quickening and that an embryo became "vitalized" at the earliest stage of utero-gestation. Intervenor's brief, pp. 32–33.

In my opinion, the above argument is only partially correct.

The statute of 1867 speaks of a "vitalized embryo or foetus at any stage of utero-gestation." To accept the argument that this language applies to an embryo or foetus from the time of conception would render the word "vitalized" as used in the statute, surplusage. There is an embryo or foetus present from the earliest stage of utero-gestation, and, therefore, there would be no need to add the modifier of "vitalized" if the intent of the statute was to signify

fetal existence from the time of conception.

Webster's Third New International Dictionary (unabridged) sets forth the following definition of the word "vitalized":

VITALIZE 1: to endow with vitality: give life or animation to: make vigorous or active * * *

VITALIZE signifies to arouse, usually something more or less inert or lifeless, to vital activity * * *

The word "vital" is stated by Webster's to be "akin to Latin vivere to live—more at QUICK", and, in part, is defined as:

* * * existing as a manifestation of life * * * having or characterized by life * * * full of life and vigor * * * characteristic of life or living beings: inhering in the living or organic.

Taking the usual meanings of the foregoing words into account, I would consider a "vitalized embryo or foetus" as one that, in the course of prenatal development, had reached the point of being capable of sustaining its own life form. The use of the term "vitalized" in the statute would then have some rational meaning, signifying the distinction between the embryo or foetus totally dependent on the mother for life support and that which had developed to the stage of capability of independent life. That state of existence is commonly referred to as viability, a viable unborn child being one that would be capable of sustaining life if removed from the womb. Such a construction fully comports with the contention that the statute was amended in light of advances of medical knowledge, for the old standard of quickening was based on the mother's totally subjective ability to feel life, whereas the new standard, so interpreted, would represent a more objective approach to the question of fetal development.

A further indication that the amendment of 1867 was not meant to cover all stages of pregnancy is the fact that only section two of the Act of 1834 was repealed. Section one, which had been construed as making it an offense to do like acts with regard to a pregnant woman at any stage of pregnancy, remained. The operative terms of the two statutes, however, were not the same. To assume that the legislature intended them to have the same reach would require one to ignore the plain differences in their language.

The abortion statute was again amended at the time of its incorporation into the Revised Statutes of Ohio, R.S. § 6815. In that enactment the reference to "vitalized embryo or foetus at any stage of utero-gestation" was dropped, and the statute read:

Whoever, with intent to procure the miscarriage of any woman prescribes or administers to her any medicine, drug, or substance whatever, or, with like intent, uses any instrument or means whatever, unless such miscarriage is necessary to preserve her life, or is advised by two physicians to be necessary for that purpose shall, if the woman miscarries or dies in consequence thereof, be imprisoned in the penitentiary not more than seven years nor less than one year.

It is interesting to note that this statute, substantially the same as O.R.C. § 2901.-16, was preceded in the Revised Statutes, Sections 6813 and 6814, by those portions of the original Act of 1834 concerning intoxicated physicians and the use of secret drugs, and was followed by the statute defining the offense of rape, R.S. § 6816.

There is no legislative history available which can enlighten us as to the intent of the Ohio Legislature in the adoption of the various versions of the abortion law. I find it difficult to accept the argument that such law historically represents the interest of the state in protecting fetal life from the time of conception when, as I believe to be true, the law originated as part of regulatory measures governing the practice of medicine and as a high misdemeanor was applicable only to the case of a woman pregnant with a quick child, and in its

first reenactment did not proscribe an offense prior to the time the embryo or foetus was "vitalized."

An indication that the State of Ohio's interest in the subject of abortion is as a matter of protection of public morality, rather than for protection of fetal life, is found in another section of the Ohio statutes. Chapter 2905 of the Ohio Revised Code is entitled "Offenses Against Chastity." Therein, matters relating to the subject of abortion are made the subject of three additional criminal offenses. It is a crime to sell or give away drugs for procuring abortion or miscarriage, O.R.C. § 2905.32, or to advertise the same, O.R.C. § 2905.33. Under O.R.C. § 2905.34, which is entitled "Selling, exhibiting, and possessing obscene literature or drugs for criminal purposes", included among the several offenses defined therein it is made a felony to:

> \* \* \* knowingly sell, lend, give away, exhibit, or offer to sell, lend, give away, \* \* \* or have in his possession or under his control \* \* \* *a drug, medicine, article or thing intended for causing an abortion*, or write, print, or cause to be written or printed a \* \* \* notice giving information when, where, how, of whom, or by what means any of such articles or things can be purchased or obtained \* \* \*. (emphasis added)

*Prior to the 1965 decision of the United States Supreme Court in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), declaring unconstitutional a state ban on the dissemination of information on contraception,* the specific references in Sections 2905.-32, 2905.33 and 2905.34 of the Ohio Revised Code to the subject of abortion were each coupled with a similar proscription with regard to the prevention of conception. Thus, prior to *Griswold*, the language of O.R.C. § 2905.34 emphasized in the preceding paragraph read:

> \* \* \* a drug, medicine, article, or thing intended for the prevention of conception or for causing an abortion.

Subsequent to the *Griswold* ruling each of the statutes was amended to delete the reference to contraceptive practices. The concomitant ban on abortion remains.

The most compelling evidence that the present Ohio statute is not aimed primarily at the protection of fetal life comes from the Ohio Supreme Court itself, State v. Tippie, 89 Ohio St. 35, 105 N.E. 75 (1913). The *Tippie* case involved the conviction of a physician under Section 12412 of the General Code, which was a recodification of Section 6815 of the Revised Statutes and the predecessor of O.R.C. § 2901.16.

In *Tippie*, the facts were that the woman had attempted to abort herself by the most primitive of methods, and when the resultant infection occurred, she sought medical assistance. Following three external examinations, Dr. Tippie had reason to believe that the foetus was dead. He then determined to make an internal examination and contemplated the possibility of performing an abortion. Chloroform was administered as an anesthetic, and the examination proceeded. Dr. Tippie then discovered that the foetus was not dead, and decided "to let the woman alone and give her the benefit of the doubt." As he was completing his procedures the patient died from the effects of the chloroform.

In the Court of Appeals it was urged that error had been committed by the trial court's refusal to instruct the jury that the doctor was entitled to an acquittal if he had undertaken the fatal procedure with an honest belief, based on his prior examinations, that the foetus was dead. The court agreed with that contention, Tippie v. State, 1 Ohio App. 13 (1913), stating:

> We think, therefore, that the removal of a dead foetus was not, in contemplation of the statute, producing a miscarriage.

> If done unlawfully, by unprofessional hands, or without reasonable grounds to believe the foetus to be dead, and death to the patient results, the opera-

tor would be guilty of manslaughter, but not of the crime charged.

\*     \*     \*     \*     \*     \*

Intent is of the essence of the crime, and defendant should be allowed to show an innocent intent and have the jury instructed that the evidence with reference thereto may be considered. *Id.* p. 19

However, in the Ohio Supreme Court that holding was reversed. The Supreme Court postulated the question as:

> Is the administering of chloroform (which is not an abortive drug) with the intent to produce anesthesia, as a preliminary step to carrying out the intent of removing the fetus, if it be found to be dead, administering a drug with intent to procure miscarriage? 89 Ohio St. 35, 39–40, 105 N.E. 75, 77.

The answer was in the affirmative. Without specifically considering the history of the statute, as had been done by the Court of Appeals, the Supreme Court held:

> We remark, first, that the evolution of this statute of Ohio seems to show that it was enacted in its present form to cover any case of procuring the premature removal or expulsion of the fetus, *living or dead,* with other intent than to preserve the mother's life.
>
> Second, the object of the statute is to prevent any operation, or use of drugs, for the purpose of producing an abortion upon a woman deemed to be pregnant, except to save her life. *The reason and policy of the statute is to protect women and unborn babes from dangerous criminal practice, and to discourage secret immorality between the sexes, and a vicious and craven custom amongst married pairs who wish to evade the responsibilities and burdens of rearing offspring. Id.* p. 40, 105 N.E. p. 77. (emphasis added)

It is inconceivable to me to accept the premise that the Ohio statute is primarily for the protection of *all* fetal life when the Ohio Supreme Court has declared that the existence of a live foetus is immaterial to a conviction under such statute. In my opinion, from the overall tenor of the Ohio Supreme Court's opinion, the protection of "unborn babes", enumerated as but one of the underlying objects of the statute, was secondary to the morality considerations inherent in the statute which were enunciated by that court.

It is also said that under the Ohio statute it is apparent that the offense defined by O.R.C. § 2901.16 may be committed although the woman was not actually pregnant, if the parties acted under a mistaken opinion to the contrary, and death resulted. 1 O.Jur.2d, Abortion, § 8. Such a view would indicate that the statute was intended to protect the woman involved, and certainly militates against the contention that the intent of the statute is to protect fetal life.

In the majority opinion certain rights accorded unborn children are reviewed, and it is then asserted that:

> If the law is in accord with science for the purpose of protecting property rights, how can it possibly not be in accord with science for the purpose of protecting life itself, without which no property right has any worth or value whatsoever?

I do not find that the law of Ohio recognizes property rights of unborn children to such an extent that the reasonable corollary would be to recognize superior rights of such child, at all times subsequent to conception, to those of the mother.

While it is correct that Ohio law recognizes an unborn child as having a right of inheritance, and thus such child is, in law, considered in esse from the date of its conception, *the unborn child must be born alive* in order for the expectancy to fully vest. 56 O.Jur.2d, Wills, § 615.

The Ohio courts do not appear to have yet passed upon the question of the right of a child who sustained a prenatal injury to recover for such injury follow-

ing a live birth. There appears to be a split of authority on this question, some jurisdictions denying any recovery for injuries arising from prenatal negligence, others granting an unqualified right of action, while still others condition the right to recovery upon a showing that the injury was inflicted at a time when the unborn child was viable. Annot. 27 A.L.R.2d 1256.

The Ohio courts have, on the other hand, considered the civil responsibility of a person negligently causing the death of an unborn child. While recognizing a right of action under the Ohio wrongful death statute, O.R.C. § 2125.01, the Supreme Court expressly conditioned such right to the instance of a *viable* child. Peterson v. Nationwide Mutual Ins. Co., 175 Ohio St. 551, 197 N.E.2d 194 (1964); Jasinsky v. Potts, 153 Ohio St. 529, 92 N.E.2d 809 (1950); Williams, an Infant v. Marion Rapid Transit, Inc., 152 Ohio St. 114, 87 N.E.2d 334 (1949). Such a limitation is in accord with the overwhelming weight of authority. Mace v. Jung, 210 F.Supp. 706 (D.C.Ala., 1962); Annot. 15 A.L.R.3d 992.

At common law it was held that no crime was committed by the causing of the death of a stillborn child, and that rule appears to prevail in the majority of jurisdictions in the United States, 40 Am.Jur.2d, Homicide, § 9. There is one Ohio Common Pleas decision to the contrary, State v. Dickinson, 18 Ohio Misc. 151, 248 N.E.2d 458 (1969). Therein, the court held, on the authority of the Ohio Supreme Court rulings on the civil question of wrongful death, that a *viable* unborn child was a "person" within the contemplation of the vehicular homicide statute, O.R.C. § 4511.18.1. It is clear from the court's opinion that such decision was controlled by the question of viability.

I therefore find that, under the law of Ohio, the property rights of unborn children, which the majority consider to be of great importance, either do not vest until viability occurs, or, if vested prior thereto, fail if the unborn child does not survive childbirth. Such a state of the law, in my opinion, affords little support for the Ohio abortion statute on the basis that, from the moment of conception, an unborn child is a person entitled to assert constitutional rights paramount to those of the mother. I cannot believe that under our system of constitutional law, a person who, in Ohio, maliciously or negligently terminates the existence of a non-viable foetus can do so without fear of criminal or civil sanctions, but that a physician who, exercising his best medical judgment, performs an abortion when the foetus has not yet reached viability can only do so facing the real possibility of criminal conviction if a lay jury disagrees with his opinion.

It has been suggested that the Ohio statute affords a safeguard to the individual doctor from being "second-guessed" by a jury, in that it provides that an abortion may be performed if such action "is advised by two physicians to be necessary" to save the mother's life, O.R.C. 2901.16. It was contended at oral argument that the "two physicians" rule is a complete defense to prosecution under the statute.

Disregarding the practical considerations of the economic burden that consultation with other doctors would impose upon the patient and the possibility that, under emergency conditions, such consultation might not be medically feasible, I do not find that argument to be sound. No Ohio case has been cited or found, nor has any been cited from any other jurisdiction having a similar statutory provision, which would vindicate that contention.

The "necessity" clause of the Ohio abortion law has been considered but once by the Ohio Supreme Court, in passing upon the issue of whether the prosecution had the burden of proving that the operation was not necessary, or whether the defendant had the burden of proving necessity as a matter of defense. Moody v. State, 17 Ohio St. 110 (1866). Therein, the court stated:

\* \* \* The statute does not declare every procurement of an abortion to

be an offense, but does so only when it is not done for the purpose of saving the life of the mother * * *

* * * * * *

It is the absence of the necessity of saving life, that is the essential part of the negative clauses, which enters into the statutory description of the offense; and in the contemplation of the statute, the advice of two physicians is *sufficient evidence* of the existence of such necessity.

Since, then, such advice is *only evidence* of the necessity that forms the essential negative description of the crime in both negative clauses, and as it may usually be readily shown by the accused, and must ordinarily be so difficult, if not impossible, to be shown on the part of the prosecution, it might well be held, upon reason as well as authority, that it is unnecessary for the state to prove that the producing the abortion was not advised by two physicians further than such negative fact may be implied from the proof that it was not necessary to preserve the life of the mother. *Id.* pp. 112–113 (emphasis added)

As I read the *Moody* decision, the Ohio Supreme Court, by its use of the phrases "sufficient evidence" and "only evidence", has said that the defendant in an abortion prosecution bears the burden of proving necessity to save life, and proof that such abortion was advised by two physicians would be prima facie evidence of such fact. If proof that the abortion was advised by two physicians is only prima facie evidence of the necessity to save life, it necessarily follows that such evidence would be subject to rebuttal by the prosecution. Hence, the "two physicians" rule is not a complete defense to prosecution under the statute.

There is one other aspect to this litigation, not considered in the majority opinion, to which I wish to address myself: the impact of this statute on the medical profession, and to a lesser degree the rights of those other plaintiffs herein who contend that they are hampered in their professions by its existence. Plaintiffs Steinberg, Fitzgerald, Frank and Argow contend that this statute prevents them from the proper discharge of their professional responsibilities in the respective fields of obstetrics and gynecology, psychiatry, social work, and the ministry.

Defendants and intervenor contend that as to those persons who claim that they are prevented from orally disseminating information about abortion the statute imposes no restraints, in that it only reaches the actual attempt to procure an abortion. That position is plainly incorrect.

If an attempt to procure an abortion were made pursuant to such advice, the party not actually performing the operation would, under Ohio law, be deemed culpable as an aider and abettor. 1 O.Jur.2d, Abortion, § 3. Such a conviction of a physician has, in fact, been affirmed by the Ohio courts, State v. Smith, appeal dismissed 165 Ohio St. 247, 135 N.E.2d 63 (1956), and was the factual predicate from which the landmark case of People v. Belous, supra, arose.

Assuming for the sake of argument that the contention of defendants and intervenor was correct, this would place the physician in the position of saying to his patient that, in the exercise of his best medical judgment, an abortion was advisable but that the law prevented him from performing the same. I cannot conceive of placing a professional man in a more frustrating position.

The duty and judgment of the physician, the necessity and welfare of the patient, and the rights of both, cannot be subjected to arbitrary and unreasonable legislative interference, dictation and infringement. United States v. Freund, 290 F. 411, 414 (D.C.Mont., 1923); see also 70 C.J.S. Physicians and Surgeons § 3, p. 820 et seq. It is my belief that Section 2901.16 of the Ohio Revised Code, by virtue of its vagueness and lack of responsiveness to the realities of modern medicine, can no longer be considered as a reasonable regulatory

measure as it affects the practice of medicine.

In Williams v. Marion Rapid Transit, Inc., 152 Ohio St. 114, 126, 87 N.E.2d 334, 339 (1929), the Ohio Supreme Court expressed the hope that "the law will keep pace with science." In my opinion, continued enforcement of O.R.C. § 2901.-16 keeps the law many years behind the medical profession.

The "chilling" effect of legislation of this scope upon the medical profession has been recognized. In Judge Neville's concurring opinion in Doe v. Randall, 314 F.Supp. 32 (D.C.Minn., 1970), he states:

> I subscribe to the view that the entire medical profession and innumerable pregnant women live under the sword of Damocles. The exercise of their best medical judgment, the giving of advice and the pregnants' freedom of choice is "chilled" by the cloud of a statute which renders their actions illegal and puts them in jeopardy of criminal prosecution with the resultant publicity, possible public disgrace, loss of hospital privileges, threat of license revocation, etc. Id. p. 36

In Babbitz v. McCann, 310 F.Supp. 293 (D.C.E.D.Wis., 1970) the court entered a declaratory judgment holding the Wisconsin abortion statute unconstitutional, but declined to enter an order enjoining the operation of said statute. That decision on the injunctive side of the suit has now been withdrawn, and a permanent injunction entered restraining further prosecutions under the abortion law (order of November 18, 1970). The Wisconsin authorities had announced that they would not abide by the declaratory judgment in pursuing further criminal actions under the challenged statute. It appears that a substantial factor influencing the court's decision to reverse its prior holding was the "chilling" effect it believed the state's determination to continue to enforce the abortion law would have upon the medical profession.

My dissent herein should not be construed as indicating a belief that the state has no right to adopt legislation controlling on the subject of abortion. I wish to make it quite clear that I recognize the right of the state to adopt and enforce reasonable regulations in this area. Such legislation, however, must be couched in precise and relevant terms, and must accord proper recognition to the interests of all persons concerned therewith. A number of states have adopted therapeutic abortion laws which, in my opinion, are a step in the right direction. Note, Abortion Reform: History, Status and Prognosis, 21 Case W.Res.L.Rev. 521–522 (1970).

It is suggested in the majority opinion that this problem is one for the legislature and not for the courts. Serious efforts to achieve legislative reform have been undertaken in recent years, have been subject to intensive lobbying by those interests opposing any liberalization of the abortion laws, and have failed. While the courts are not a panacea for all of society's ills, they cannot refuse to act simply because the legislature fails to do so. It took a decision of the United States Supreme Court to motivate the Ohio Legislature to remove from the Ohio statutes the archaic ban on the dissemination of information with regard to contraception.

The fatal flaw which I find in O.R.C. § 2901.16 is that it carries forward the constitutional standards of Nineteenth Century America into the complex and advanced structure of our Twentieth Century society. Such standards cannot withstand the changes created by the transition from the primitive frontier life of 1834 to the onmoving urban existence of 1970.

I am of the opinion that a woman has the private right to control her own person, which necessarily encompasses the fundamental right to choose whether to bear children.

I am also of the opinion that a physician has the right and duty to practice his chosen profession to the best of his ability, which necessarily includes the

discretion to perform those procedures which, in his expert medical judgment, he deems to be in his patient's best interests.

The question of producing a miscarriage during the early stages of a woman's pregnancy, and certainly prior to viability, should be a private matter between the woman and her physician. A woman who seeks therapeutic abortion and a physician who concurs in such course of treatment, or who in the first instance recommends the same, should not be subject to a virtually absolute threat of criminal prosecution and punishment unless the state has a compelling interest in regulating such conduct. I do not believe that this record, or those matters of which the court could take judicial notice, establish any compelling state interest which would justify the enforcement of legislation interfering with a woman's right to secure, and a physician's right to perform, a therapeutic abortion during the early stages of pregnancy.

I must respectfully enter my dissent from the opinion of the majority herein, as I believe the Ohio abortion statute, O.R.C. § 2901.16, to be unconstitutionally vague, overly broad, violative of equal protection of the law, and in conflict with the principles set forth by the Supreme Court in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). I would enter a declaratory judgment finding the said statute to be invalid for the reasons set forth herein.

## APPENDIX

Ohio decisions under O.R.C. § 2901.16 and the predecessors thereto:

*Ohio Supreme Court*

Wilson v. State, 2 Ohio St. 319 (1853)

Robbins v. State, 8 Ohio St. 131 (1857)

Moody v. State, 17 Ohio St. 110 (1866)

Ohio v. Barker, 28 Ohio St. 583 (1876)

Tabler v. Ohio, 34 Ohio St. 127 (1877)

Benedict v. State, 44 Ohio St. 679, 11 N.E. 125 (1887)

State v. McCoy, 52 Ohio St. 157, 39 N.E. 316 (1894)

State v. Tippie, 89 Ohio St. 35, 105 N.E. 75 (1913)

Ohio v. Lehr, 97 Ohio St. 280, 281, 119 N.E. 730 (1918)

Ohio v. Karcher, 155 Ohio St. 253, 98 N.E.2d 308 (1951)

Ohio v. Smith, 165 Ohio St. 247, 135 N.E.2d 63 (1956)

*Ohio Appellate*

Florien v. Ohio, 18 Ohio Civ.Ct.R. 596 (1897)

Waite v. Ohio, 4 Ohio App. 451 (1915)

Jones v. State, 11 Ohio App. 441 (1919)

Schneider v. State, 1 Ohio Law Abst. 75 (1922)

Vargo v. State, 1 Ohio Law Abst. 830 (1923)

Schunn v. State, 2 Ohio Law Abst. 186 (1923)

Emery v. State, 3 Ohio Law Abst. 62 (1924)

Shellenberger v. Ohio, 26 Ohio Law Rep. 619 (1928)

Clyne v. Ohio, 32 Ohio Law Rep. 477 (1930)

Novaksky v. State, 18 Ohio Law Abst. 313 (1934)

State v. Hollos, 76 Ohio App. 521, 65 N.E.2d 144 (1944)

Ohio v. Jones, 80 Ohio App. 269, 70 N.E.2d 913 (1946)

State v. Taylor, 83 Ohio App. 76, 77 N.E.2d 279 (1947)

State v. Coran, 87 Ohio App. 238, 94 N.E.2d 562 (1948)

State v. McDaniel, 85 Ohio App. 529, 89 N.E.2d 664 (1949)

State v. Roche, Ohio App. 135 N.E.2d 789, 72 Ohio L.A. 462 (1955)

State v. Brown, Ohio App., 137 N.E.2d 609, 73 Ohio L.A. 349 (1955)

State v. Allgood, 84 Ohio L.A. 367 (1959)

Ohio v. Ball, 1 Ohio App.2d 297, 204 N.E.2d 557 (1964)

*Common Pleas Court*

State v. Springer, 4 Ohio Dec. 169

Geer v. Ohio, 16 Ohio Cir.Ct.R.,N.S., 151 (1909)

Bridge v. Ohio, 20 Ohio Cir.Ct.R.,N.S., 231 (1912)

Ohio v. Holden, 20 Ohio N.P.,N.S., 200 (1917)