Sidney G. **BABBITZ**, M. D., Plaintiff,

v.

E. Michael **McCANN**, District Attorney of Milwaukee County, F. Ryan Duffy, Jr., Judge of the County Court, Milwaukee County, Defendants.

No. 69–C–548.

United States District Court,
E. D. Wisconsin.

March 5, 1970.

Nathaniel Rothstein, Milton R. Bordow and Roy O. Conen, Milwaukee, Wis., for plaintiff.

E. Michael McCann, Dist. Atty., Milwaukee, Wis., for defendants.

Before KERNER, Circuit Judge, and REYNOLDS and GORDON, District Judges.

PER CURIAM.

The plaintiff is a physician who challenges the constitutionality of the Wisconsin abortion statute. He seeks an injunction restraining the defendants from enforcing a part of Wis.Stat. § 940.04 and a judgment declaring it unconstitutional.

A temporary restraining order was denied by the order of a single-judge district court, 306 F.Supp. 400, and the instant three-judge district court was convened to consider the other issues presented. We hold that portions of the statute are constitutionally invalid, but we decline to enjoin the pending state prosecution of the plaintiff.

The plaintiff is being prosecuted by the district attorney of Milwaukee county for allegedly having performed an abortion in violation of § 940.04, Wis. Stats. The statute provides in part as follows:

"(1) Any person, other than the mother, who intentionally destroys the life of an unborn child may be fined not more than $5,000 or imprisoned not more than 3 years or both.

"(2) any person, other than the mother, who does either of the following may be imprisoned not more than 15 years:

"(a) Intentionally destroys the life of an unborn quick child; or

\*　　\*　　\*　　\*　　\*　　\*

"(5) This section does not apply to a therapeutic abortion which:

"(a) Is performed by a physician; and

"(b) Is necessary, or is advised by 2 other physicians as necessary, to save the life of the mother; and

"(c) Unless an emergency prevents, is performed in a licensed maternity hospital.

"(6) In this section 'unborn child' means a human being from the time of conception until it is born alive."

The state warrant issued against Dr. Babbitz reads as follows:

"That the above named Defendant on the 6th day of September, 1969, in the County of Milwaukee, Wisconsin, did feloniously destroy the life of an unborn child of one, [woman], said offense occurring at number 231 West Wisconsin Avenue, Milwaukee, Wisconsin, said abortion not being advised by two other physicians as necessary to save the life of [woman], the mother of said child, said information being obtained by sworn testimo-

ny of [woman] before the Honorable Christ T. Seraphim, County Judge, acting as magistrate."

■ The complaint asserts that there is jurisdiction in this court pursuant to 28 U.S.C. § 1343, 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202; we agree with such position.

The complaint charges that the Wisconsin statute is unconstitutional for violating the first and fourteenth amendments of the United States Constitution and for abridging the mother's right of privacy. Dr. Babbitz has not been charged with having destroyed an unborn child which was "quick", and therefore subsections (2) and (2) (a) of the statute quoted above are not applicable in the instant case. There is no allegation that the state officials are acting in bad faith in prosecuting Dr. Babbitz.

## I.  ABSTENTION

■ The plaintiff has alleged a deprivation of rights secured by the Constitution, and serious federal questions are raised here concerning the constitutionality of certain portions of the Wisconsin abortion statute. Since the complaint seeks injunctive relief and since the statute in question has state-wide operation, the designation of a three-judge court was appropriate under 28 U.S.C. § 2281.

The request for an injunction raises a threshold problem of abstention. Congress, in 28 U.S.C. § 2283, has stated a strong policy of abstention, as follows:

"Stay of State court proceedings. A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

Except for those rather recent cases which have noted exceptions to the scope of § 2283, the federal courts have generally given the statute literal application. In addition, the policy of abstention has found expression in a long history of judge-made rules of federal judicial forebearance. Mr. Justice Frankfurter's expressions in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 500–501, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941), typify these court-fashioned rules of abstention:

"Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies, whether the policy relates to the enforcement of the criminal law, Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927; Spielman Motor Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322; or the administration of a specialized scheme for liquidating embarrassed business enterprises, Pennsylvania v. Williams, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841, 96 A. L.R. 1166; or the final authority of a state court to interpret doubtful regulatory laws of the state, Gilchrist v. Interborough Co., 279 U.S. 159, 49 S. Ct. 282, 73 L.Ed. 652; cf. Hawks v. Hamill, 288 U.S. 52, 61, 53 S.Ct. 240, 77 L.Ed. 690. These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion', restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary."

The abstention policy has also played a role in the development of the law of removal of pending state cases to the federal courts. In City of Greenwood, Miss. v. Peacock, 384 U.S. 808, 828, 86 S.Ct. 1800, 1812, 16 L.Ed.2d 944 (1966), the Supreme Court observed:

"* * * the vindication of the defendant's federal rights is left to the state courts except in the rare situations where it can be clearly predicted by reason of the operation of a pervasive and explicit state or federal law that those rights will inevitably be denied by the very act of bringing the defendant to trial in the state court."

The approach to abstention which this policy requires has been followed by many federal courts without any general exception being recognized for cases arising under 42 U.S.C. § 1983. Boyle v. Landry, 422 F.2d 631 (7th Cir. February 5, 1970); Goss v. Illinois, 312 F.2d 257, 259 (7th Cir. 1963); Smith v. Village of Lansing, 241 F.2d 856 (7th. Cir. 1957); Baines v. City of Danville, 337 F.2d 579 (4th Cir. 1964); Vick v. Schiro, 296 F.Supp. 173 (E.D.La.1969). Cf. Cooper v. Hutchinson, 184 F.2d 119 (3rd Cir. 1950).

One of the reasons underlying this practice of refusing to enjoin pending state prosecutions is particularly apposite to the case at bar. In Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138 (1951), a federal court was petitioned to enjoin the use of illegally seized evidence in a state criminal trial. Denying relief, the Supreme Court said, at page 123, 72 S.Ct. at page 121–122:

> "The consequences of exercising the equitable power here invoked are not the concern of a merely doctrinaire alertness to protect the proper sphere of the States in enforcing their criminal law. If we were to sanction this intervention, we would expose every State criminal prosecution to insupportable disruption. Every question of procedural due process of law—with its far-flung and undefined range—would invite a flanking movement against the system of State courts by resort to the federal forum, with review if need be to this Court, to determine the issue. Asserted unconstitutionality in the impaneling and selection of the grand and petit juries, in the failure to appoint counsel, in the admission of a confession, in the creation of an unfair trial atmosphere, in the misconduct of the trial court—all would provide ready opportunities, which conscientious counsel might be bound to employ, to subvert the orderly, effective prosecution of local crime in local courts."

Notwithstanding the impressive authority which would bar our enjoining the prosecution of Dr. Babbitz, he presses us to issue such an injunction. Perhaps he draws comfort from the fact that the United States Supreme Court has on two separate occasions expressly reserved ruling on the question whether the Civil Rights Act suspends the anti-injunction provisions of § 2283. Cameron v. Johnson, 390 U.S. 611, 614, n. 3, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); Dombrowski v. Pfister, 380 U.S. 479, 484, n. 2, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

Also, the plaintiff may arguably find support for his position from expressions by several of the justices of the United States Supreme Court. For example, in Gorun v. Fall, 393 U.S. 398, 399, 89 S.Ct. 678, 679, 21 L.Ed.2d 628 (1969), four members of the Court referred to "our recent decisions saying over and over again that a federal claim in a federal court should be decided by the federal court and not relegated to a state tribunal".

Finally, it may seem somewhat anomalous that a court may find a state statute unconstitutional and yet deny an injunction against its enforcement by the state. In effect, such a ruling might protect all persons from prosecution except the very man who has persuaded us of the statute's unconstitutionality.

Notwithstanding these arguments, we do not believe that the circumstances of this case justify an exception to the oft-repeated and strong policy of federal abstention, especially in a criminal case. The forebearance required under § 2283 is not lifted in the case at bar by the teachings of Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). We have already noted that the case at bar does not involve a bad faith enforcement of the abortion statute. In addition, we doubt that the prosecution of Dr. Babbitz has resulted in a chilling of his first amendment rights. A first amendment right is more than a personal right; it is also a public right. When such a right is impinged, the general public is hurt, and the effective functioning of our free society is encum-

bered. This may explain why § 2283 is not strictly applied in first amendment cases. We do not accept the plaintiff's claim that his prosecution under the state abortion statute dampened his first amendment rights.

Although the subject of abortion is fraught with highly emotional pressures, we do not find here any "special circumstances" as discussed in Cameron v. Johnson, 390 U.S. 611, 618, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), which would entitle Dr. Babbitz to injunctive action. Cf. Machesky v. Bizzell, 414 F. 2d 283 (5th Cir. 1969); Romero v. Weakley, 226 F.2d 399 (9th Cir. 1955); 80 Harv.L.Rev. 604, 608–9 (1967).

We believe we must apply the standard established in Douglas v. City of Jeanette, 319 U.S. 157, 163, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); there the Supreme Court observed that it was Congressional policy to leave to the state courts the trial of state criminal cases, and that such proceedings should be enjoined only in exceptional circumstances. We do not regard this as an exceptional case, and Dr. Babbitz is not entitled to injunctive relief. In the event that the state persists in the prosecution of Dr. Babbitz, we have no reason to doubt that the state courts of Wisconsin will fully vindicate his federal constitutional rights. See Zwicker v. Boll, 270 F.Supp. 131 (W.D.Wis.1967), aff'd 391 U.S. 353, 88 S.Ct. 1666, 20 L.Ed.2d 642 (1968); Soglin v. Kauffman, 286 F.Supp. 851 (W.D.Wis.1968).

Notwithstanding our denial of injunctive relief, a federal court is obliged to weigh separately the issue of declaratory relief. In Zwickler v. Koota, 389 U.S. 241, 254, 88 S.Ct. 391, 399, 19 L.Ed.2d 444 (1967), the Supreme Court held that the federal district court must decide the "merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction". Although it was the application for an injunction which triggered the appointment of this three-judge court under § 2281, we do not understand that the denial of injunctive relief precludes us from resolving the declaratory judgment application.

## II. VAGUENESS

The plaintiff urges that § 940.-04(5), Wis.Stats., is vague and nebulous upon its face. That subsection, quoted above, excepts a therapeutic abortion when it is performed under specified terms. We have examined the challenged phraseology and are persuaded that it is not indefinite or vague. In our opinion, the word "necessary" and the expression "to save the life of the mother" are both reasonably comprehensible in their meaning.

The United States Supreme Court has ruled that a criminal statute must be definite enough to acquaint those who are subject to it with the conduct which will render them liable to its penalties. Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939); Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). See also Unconstitutional Uncertainty—An Appraisal, 40 Cornell Law Quarterly, 195, 196 (1955).

We believe that § 940.04(5) sets forth with reasonable clarity and sufficient particularity the kind of conduct which will constitute a violation. Jordan v. De George, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951); United States v. Ragen, 314 U.S. 513, 62 S.Ct. 374, 86 L.Ed. 383 (1942). In United States v. Wurzbach, 280 U.S. 396, 399, 50 S.Ct. 167, 169, 74 L.Ed. 508 (1930), Mr. Justice Holmes stated:

"Whenever the law draws a line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so, it is familiar to the criminal law to make him take the risk."

In People v. Belous, 80 Cal.Rptr. 354, 458 P.2d 194 (1969), the California court found that the words "necessary to preserve her life" in that state's abortion statute were unconstitutionally

vague. While the Wisconsin statute uses slightly different language ("necessary to save"), we doubt that the distinction between the words used in the two statutes is significant. However, we do not share the view of the majority in *Belous* that such language is so vague that one must guess at its meaning.

Slightly different language was before the court in United States v. Vuitch, 305 F.Supp. 1032 (D.D.C.1969), which invalidated an abortion law. That statute contained the following expression: "necessary for the preservation of the mother's life or health". The court concluded that the word "health" was vague both in interpretation and in practice. That precise problem is not presented under the terms of the Wisconsin statute.

Our reading of the Wisconsin statute persuades us that it meets the test set forth by the United States Supreme Court in *Connally*, cited above, 269 U.S. at page 391, 46 S.Ct. at page 127:

> "And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."

The plaintiff also charges that there is confusion in subsection (6), which provides that the words "unborn child" mean "a human being from the time of conception until it is born alive". The plaintiff may have medical or even practical justification for his disagreement with the correctness of this statutory definition of an unborn child, but he fails in his effort to convince us that the Wisconsin legislature was vague or indefinite in its choice of language.

## III. EQUAL PROTECTION OF THE LAWS

The plaintiff contends that the statute denies to him equal protection of the laws as guaranteed by the fourteenth amendment. It is urged that medical facilities are not constant throughout the state and that a doctor in a rural area in Wisconsin might be justified in performing a "necessary" abortion, whereas a doctor treating the same patient in Milwaukee would be unwarranted in performing the abortion because of the availability in Milwaukee of superior medical facilities.

■ We find more cogency in the argument that a wealthy woman, but not a poor one, is able, upon demand, to secure a safe and legal abortion in Japan or some other locale in which abortion is permitted. We take judicial notice of the fact that there are a number of places throughout the world where legal abortions are available. We have also considered the argument that an affluent woman, unlike the poor one, may enjoy a long-standing, personal relationship with a well-paid physician, who might more likely be willing or able to persuade his fellow doctors to authorize a therapeutic abortion. We are reluctant to equate these types of inequality with a denial of a protected right under the fourteenth amendment. We know of no analogous situation which goes as far as the plaintiff would have us go in applying the fourteenth amendment to the case at bar.

There is presently pending in the United States Supreme Court a challenge to the practice of imposing a jail term upon a defendant who is unable to pay an assessed fine. Williams v. Illinois, 396 U.S. 1036, 90 S.Ct. 689, 24 L.Ed. 2d 680, probable jurisdiction noted January 19, 1969, being an appeal from People v. Williams, 41 Ill.2d 511, 244 N.E.2d 197 (1969). We cannot anticipate that the decision in the *Williams* case will buttress the plaintiff's contention that there is a denial of equal protection of the laws implicit within the Wisconsin abortion statute.

## IV. INVASION OF PRIVATE RIGHTS

The ninth amendment to the United States Constitution provides:

> "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

An examination of recent Supreme Court pronouncements regarding the ninth amendment compels our conclusion that the state of Wisconsin may not, in the manner set forth in § 940.04(1) and (5), Wis.Stats., deprive a woman of her private decision whether to bear her unquickened child.

In terms of the Wisconsin statute, we do not purport to decide the question of a woman's aborting a fetus which has already quickened. We received into evidence the view of a gynecologist that a fetus normally becomes quick at about four and a half months after conception. Dorland's Illustrated Medical Dictionary (24th ed. 1965) defines "quick" as "Pregnant and able to feel the fetal movements." "Quickening" is defined as "The first recognizable movements of the fetus in utero, appearing usually from the sixteenth to the eighteenth week of pregnancy." The plaintiff is being prosecuted under § 940.04(1) and (5); he is not being prosecuted under those portions of § 940.04 which relate to the abortion of a quickened child; therefore, the validity of such provisions are beyond the scope of this opinion.

While problems of over-population, ecology and pollution have been brought to our attention, we deem them secondary as decisional factors in a judicial resolution of the issues at hand. So, too, we find it necessary to set aside arguments involving theological and ecclesiastical considerations.

Obviously, there is no topic more closely interwoven with the intimacy of the home and marriage than that which relates to the conception and bearing of progeny. Recent court cases have considered the sanctity of the right to privacy in home, sex and marriage; however, the concept of private rights, with which the state may not interfere in the absence of a compelling state interest, is one of long standing.

As long ago as 1891, in Union Pacific Railway Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891), the court said:

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. As well said by Judge Cooley, 'The right to one's person may be said to be a right of complete immunity: to be let alone.' "

In Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), the United States Supreme Court held that the private right "to marry, establish a home and bring up children" was protected under the fourteenth amendment as an essential liberty. In Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), the court spoke of the "private realm of family life which the state cannot enter".

In Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), there was a challenge to the constitutionality of a state statute which purported to restrict marriages solely on the basis of race. While the Supreme Court observed, at page 7, 87 S.Ct. at page 1821, that "marriage is a social relation subject to the State's police power," the court held, at page 12, 87 S.Ct. at page 1824:

"The Fourteenth Amendment requires that the freedom of choice to marry not be restricted by invidious racial discriminations. Under our Constitution, the freedom to marry or not marry, a person of another race resides with the individual and cannot be infringed by the State."

See also Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); Farrington v. T. Tokushige, 273 U.S. 284, 47 S.Ct. 406, 71 L.Ed. 646 (1927); Pierce v. Society of the Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). See, generally, Warren and Brandeis, "The Right to Privacy," 4 Harv.L.Rev. 193 (1890).

Recent decisions have asserted a judicial application of the ninth amendment

to the matter of privacy in marital relations and contraception. In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the court struck down the Connecticut statute which forbade the use of contraceptives. In so doing, the Court noted that the Bill of Rights contains both specific and penumbral guarantees which protect an individual from governmental invasion of the sanctity of his home and the privacies of his life. In the words of the Court, at page 485, 85 S.Ct. at page 1682, many decisions by the Supreme Court "bear witness that the right of privacy which presses for recognition here is a legitimate one." Three of the justices in a concurring opinion stated, at page 491, 85 S.Ct. at page 1685:

> "To hold that a right so basic and fundamental and so deep-rooted in our society as the right of privacy in marriage may be infringed because that right is not guaranteed in so many words by the first eight amendments to the Constitution is to ignore the Ninth Amendment and to give it no effect whatsoever."

In People v. Belous, 80 Cal.Rptr. 354, 458 P.2d 194 (1969), the California supreme court invalidated a state statute which made it illegal to perform an abortion on a woman unless it was necessary to preserve her life. The court said, 80 Cal.Rptr. at page 359, 458 P.2d at page 199:

> "The fundamental right of the woman to choose whether to bear children follows from the Supreme Court's and this court's repeated acknowledgment of a 'right of privacy' or 'liberty' in matters related to marriage, family, and sex."

The *Belous* court pointed out, 80 Cal. Rptr. at page 360, 458 P.2d at page 200, that although this protected area of privacy is not explicitly stated in the Constitution, it is a fundamental liberty that is implicit in the penumbrae of the Bill of Rights, and is supported, by analogy, in many past decisions.

In United States v. Vuitch, 305 F. Supp. 1032, 1035 (D.D.C.1969), the court further observed:

> "There has been, moreover, an increasing indication in decisions of the Supreme Court of the United States that as a secular matter a woman's liberty and right of privacy extends to family, marriage and sex matters and may well include the right to remove an unwanted child at least in early stages of pregnancy."

Although no final decision has as yet been rendered, a three-judge court has been convened in New York in a case involving the same issues under consideration here. Hall v. Lefkowitz, 305 F. Supp. 1030 (S.D.N.Y.1969).

In 2 Loyola University Law Review 1, 8 (April, 1969), former Supreme Court Justice Tom C. Clark concluded from a study of *Griswold* and its predecessor cases:

> "The result of these decisions is the evolution of the concept that there is a certain zone of individual privacy which is protected by the Constitution. Unless the State has a compelling subordinating interest that outweighs the individual rights of human beings, it may not interfere with a person's marriage, home, children and day-to-day living habits. This is one of the most fundamental concepts that the Founding Fathers had in mind when they drafted the Constitution."

It is clear that in order to justify the regulation of such fundamental private rights, the state must show a compelling need. In Bates v. City of Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960), the Court stated:

> "Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling."

The Supreme Court, in *Griswold*, said, 381 U.S. at page 485, 85 S.Ct. at 1682:

> "The present case, then, concerns a relationship lying within the zone of privacy created by several fundamental constitutional guarantees. And it concerns a law which, in forbidding the *use* of contraceptives rather than

regulating their manufacture or sale, seeks to achieve its goals by means having a maximum destructive impact upon that relationship. Such a law cannot stand in light of the familiar principle, so often applied by this Court, that a 'governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.' NAACP v. Alabama, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325."

A comparable viewpoint was set forth by the California supreme court in *Belous,* 80 Cal.Rptr. at page 360, 458 P.2d at page 200, where that court said:

"The critical issue is not whether such rights exist, but whether the state has a compelling interest in the regulation of a subject which is within the police powers of the state * * *."

Similarly, in the case at bar, we must decide whether the state of Wisconsin has a sufficiently compelling interest to justify the broad restriction on a woman's inherently personal right that is contained in § 940.04(1) and (5), Wis. Stats.

The defendants urge that the state's interest in protecting the embryo is a sufficient basis to sustain the statute. Upon a balancing of the relevant interests, we hold that a woman's right to refuse to carry an embryo during the early months of pregnancy may not be invaded by the state without a more compelling public necessity than is reflected in the statute in question. When measured against the claimed "rights" of an embryo of four months or less, we hold that the mother's right transcends that of such an embryo.

We also find no compelling state interest in a need to protect the mother's life. At common law, abortion was not a crime unless the mother was quick with child. People v. Belous, supra, 80 Cal.Rptr. at 358, 458 P.2d at 198. This position was reflected in the original Wisconsin abortion statute, Wis.R.S.

1849, c. 133, §§ 10 and 11, enacted in 1849, which made abortion a punishable offense only if performed upon an unborn quick child. However, in 1858 the abortion statute was revised by elimination of the word "quick," thereby making it an offense to perform an abortion at any time during pregnancy. This change reflected an interest in protecting the life of the mother, for in 1858 any surgical procedure done inside the body was extremely dangerous. Today, many types of surgery, including abortion in the first trimester, are safe and routinely employed medical techniques. People v. Belous, supra, 80 Cal.Rptr. at 360, 458 P.2d at 200. Thus, the result of this court's decision that a mother has the right to determine whether to carry or reject an embryo that has not quickened is a return to the common law definition of abortion; this is not a position without well-established precedent in the common law.

We are persuaded that a medical abortion during early pregnancy is not inherently dangerous to the mother. Nor do we find a compelling state interest in connection with the discouragement of non-marital sexual intercourse. The statute involved does not purport to distinguish between married and unmarried women.

We are invited to resolve the philosophical question, raised in some of the amicus curiae briefs, as to when an embryo becomes a child. For the purposes of this decision, we think it is sufficient to conclude that the mother's interests are superior to that of an unquickened embryo, whether the embryo is mere protoplasm, as the plaintiff contends, or a human being, as the Wisconsin statute declares.

There are a number of situations in which there are especially forceful reasons to support a woman's desire to reject an embryo. These include a rubella or thalidomide pregnancy and one stemming from either rape or incest. The instant statute does not distinguish these special cases, but in our opinion, the state does not have a compelling in-

terest even in the normal situation to require a woman to remain pregnant during the early months following her conception.

■ Under its police power, the state can regulate certain aspects of abortion. Thus, it is permissible for the state to require that abortions be conducted by qualified physicians. The police power of the state does not, however, entitle it to deny to a woman the basic right reserved to her under the ninth amendment to decide whether she should carry or reject an embryo which has not yet quickened. The challenged sections of the present Wisconsin statute suffer from an infirmity of fatal overbreadth.

## V. CONCLUSION

The plaintiff is entitled to a declaratory judgment declaring § 940.04(1) and (5) violative of the United States Constitution. The plaintiff is not entitled to an injunction enjoining the defendants or their successors in office from prosecuting the plaintiff under § 940.-04(1) and (5).

It is so ordered.