505 P.2d 580

Gary K. NELSON, The Attorney General of the State of Arizona, et al., Appellants and Cross-Appellees,

v.

PLANNED PARENTHOOD CENTER OF TUCSON, INC., et al., Appellees and Cross-Appellants,

and

D. E. Clark, M.D.; Neil C. Clements, M.D.; John M. Gillette, M.D.; William L. Martin, M.D.; Wallace W. McWhirter, M.D.; the Arizona Right To Life Committee, an Arizona corporation, and Arizona Public Health Association, Amici Curiae.

No. 2 CA–CIV 1302.

Court of Appeals of Arizona, Division 2.

Jan. 3, 1973.

As Modified on Rehearing Jan. 30, 1973.

Rehearing Denied Feb. 20, 1973.

Review Denied March 20, 1973.

Gary K. Nelson, Atty. Gen. by John S. O'Dowd, Asst. Atty. Gen., Rose Silver, Pima. County Atty. by John R. Neubauer, ·Deputy County Atty., Tucson, for appellants and cross-appellees.

Murphy, Vinson & Hazlett by John U. Vinson, Tucson, for appellant and cross-appellee Bloom.

Miller, Pitt & Feldman, P. C. by Stanley G. Feldman, Elaine S. Pollock, Tucson, for appellees and cross-appellants.

Merchant, Lohse & Bloom by William A. Riordan, Tucson, for amici curiae.

Sullivan, Mahoney & Tang, Phoenix, Associate Counsel for amici curiae.

Paul G. Rees, Jr., Tucson, for amicus curiae Ariz. Public Health Assn.

HOWARD, Judge.

Appellants were the defendants in an action filed in the Superior Court of Pima County wherein appellees sought a declaratory judgment under A.R.S. § 12–1831 et seq., adjudicating the following sections of Arizona Revised Statutes, relating to abortion, to be void for unconstitutionality under the Constitutions of the United States and the State of Arizona:

"§ 13–211. . . .

A person who provides, supplies or administers to a pregnant woman, or procures such woman to take any medicine, drugs or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, unless it is necessary to save her life, shall be punished by imprisonment in the state prisson for not less than two years nor more than five years.

§ 13–212. . . .

A woman who solicits from any person any medicine, drug or substance whatever, and takes it, or who submits to an operation, or to the use of any means whatever, with intent thereby to procure a miscarriage, unless it is necessary to preserve her life, shall be punished by imprisonment in the state prison for not less than one nor more than five years.

§ 13–213. . . .

A person who wilfully writes, composes or publishes a notice or advertisement of any medicine or means for producing or facilitating a miscarriage or abortion, or for prevention of conception, or who offers his services by a notice, advertisement or otherwise, to assist in the accomplishment of any such purposes, is guilty of a misdemeanor."

Appellee Planned Parenthood Center of Tucson, Inc., is a nonprofit corporation or-

ganized pursuant to the laws of the State of Arizona and is actively engaged in providing family planning services in the metropolitan area of Tucson, Arizona; appellees Herbert Pollock, John McEvers, Max Costin, Nathaniel Bloomfield, Arnold Lilien, Louis Brunsting, Stuart Edelberg, Damon Raphael, Robert Oliver and David Trisler, are physicians licensed to practice medicine within the State of Arizona and are practicing the specialty of obstetrics and gynecology within Pima County, Arizona.

A "Jane Doe" was a plaintiff in the trial court when the action was commenced. "Jane Roe" was later substituted for Jane Doe and prior to the conclusion of the trial it was stipulated that Jane Roe had obtained an out-of-state abortion.

Appellees alleged that except for the risk of criminal prosecution the appellee Planned Parenthood Center of Tucson, Inc., would refer some of its clients to licensed physicians, when medically justified, in order that abortions could be performed on them to terminate pregnancy, although the procedures were not necessary to save the lives of such pregnant women. These clients would include women who might be suffering from diseases which would present either a substantial risk that the fetus would be born with grave birth defects or would prevent them from adequately caring for the children after birth. Their complaint also alleged that appellee Planned Parenthood Center of Tucson, Inc., if it were not for the risk of criminal prosecution, would afford its services, where medically justifed, by means of notices, advertisements and otherwise to assist its clients in procuring abortions and preventing conception.

It was further alleged that the ten named physicians, except for the risk of criminal prosecution under the abortion statutes, would respectively perform or arrange for the performance of abortions on pregnant women, where medically indicated, even though such procedures might not be necessary to save the lives of such women.

The question as to whether a justiciable controversy existed has been previously answered in the affirmative by this court. Planned Parenthood Center of Tucson, Inc. v. Marks, 17 Ariz.App. 308, 497 P.2d 534 (1972).

The trial court, in a memorandum opinion, held that a fetus is not a person entitled to Fourteenth Amendment rights and does not have constitutionally protected rights; that A.R.S. § 13–211 is overbroad and violates the fundamenal right of marital and sexual privacy of women guaranteed by the Ninth and Fourteenth Amendments to the United States Constitution; and that A.R.S. § 13–211 also violates the constitutional rights of physicians who attend to the medical needs of pregnant women because it denies each physician his right to practice medicine in a manner which permits him to fulfill his professional ethical obligation to his patient. It entered a declaratory judgment in favor of the appellees and against the appellants and enjoined appellants from enforcing the provisions of Arizona's abortion statutes against appellees and their patients, present or prospective. Appellees cross-appeal from that part of the judgment which limited the injunctive relief to them.

At the outset we observe that the concern of both appellants and appellees is motivated by the highest of moral considerations and one should not question the good intentions of either side. Abortion is at once a moral, medical, legal, sociological, philosophical, demographic and psychological issue, not readily amenable to one-sided thinking.

The thrust of appellees' attack against the abortion statutes appears in their opening brief:

"Plaintiffs do not claim that the Legislature is without power to regulate abortion; Plaintiffs freely admit that the Legislature has the power to regulate such matters as the persons by whom the procedure may be performed, the places at which it may be performed, (arguably) the stage of pregnancy at which

it may be performed, and (more arguably) some of the reasons which would justify performance." [1]

They specifically attack these statutes on the following constitutional grounds: (1) A.R.S. § 13–211 is vague and indefinite; (2) the statutes violate the right of personal privacy and the right to recommend, give and receive medical treatment; (3) the statutes are an invalid exercise of the police power because there is no sufficient state interest. (This contention seems to conflict with appellees' admission that the state has a right to regulate the matter of abortion.); (4) the statutes are overbroad; (5) the statutes constitute an establishment of religion; and (6) they discriminate against women having a low economic status.

Appellees commence their argument with a major premise with which we do not agree. They argue that since our abortion statutes are modeled upon and adopted from California law, we should adhere to the legislative history of the California statutes as set forth in People v. Belous, 71 Cal.2d 954, 80 Cal.Rptr. 354, 458 P.2d 194 (1969). In considering the constitutionality of the California abortion statutes the California court remarked that abortion before quickening had not been a crime at common law and that abortion statutes were enacted primarily to protect the mother's life. *Ergo*, appellees contend that Arizona's abortion statutes must be reviewed in the light of that legislative intent. Since we have no legislative history in this state, we do not know what the legislature had in mind in 1901 when the original abortion statutes were enacted. Our review of history, however, leads us to the conclusion that there is a twofold reason for the Arizona abortion laws: To embody the belief in the right to life and the necessity of preserving human life even when the existence of "human life" is problematic to some degree, and to protect the health and life of pregnant women by keeping them from incompetent abor-

tionists and restraining them from attempting dangerous, self-induced abortions.

Thus we see the destruction of the fetus treated as grounds for the death penalty under ancient Assyrian laws. T. J. Meek, "The Middle Assyrian Laws," in ancient Near Eastern Texts, 2d ed., pp. 181, 184–185 (J. B. Pritchard Edition Princeton Unversity Press). Philo, a Jewish philosopher from Alexandria, wrote in the first century that one should die who kills an unborn child if it has been "shaped and all the limbs had their proper qualities, for that which answers to this description is a human being * * * like a statue lying in a studio requiring nothing more than to be conveyed outside." Philo, De Spec Legibus 3–108–10. Henry Brockton (1216–1272), sometimes known as the "Father of the Common Law" wrote:

> "If there is anyone who has struck a pregnant woman or have given poison to her, whereby he has caused an abortion, if the fetus be already formed or animated, and especially if animated, he commits a homicide." Twiss, ed. 11 Legibus et Consuetudinibus Angliae, 278 (1879).

We do find an indication of the intent of our state legislators when the abortion statutes were enacted in 1901 as shown by A.R.S. § 13–1695 and A.R.S. § 13–1696 which were enacted at the same time. These statutes provide that if it is determined that a female prisoner under a death sentence is pregnant, her execution shall be stayed until she is no longer pregnant, at which time she may be executed.

It is clear that in the State of Arizona there is a presumption in favor of the constitutionality of a legislative enactment. State v. Krug, 96 Ariz. 225, 393 P.2d 916 (1964), and that one assailing the validity of a statute has the burden of establishing that it infringes a constitutional guarantee or violates a constitutional principle. State v. Krug, supra. It is further law in this state that the court must

---

1. Appellees' arguments are at times inconsistent with this admission.

be satisfied beyond a reasonable doubt that a statute is unconstitutional; that every intendment must be indulged in favor of the validity of a statute and that constitutional provisions shall not be given a construction which will nullify legislation, but must be liberally construed. Shaw v. State, 8 Ariz.App. 447, 447 P.2d 262 (1968).

It also must be remembered that the concept of separation of powers is fundamental to constitutional government as we know it. Each branch of government is independent, and no department may exercise powers belonging to others. Thus, the wisdom, necessity, propriety or expediency of a statute are matters exclusively within the province of the legislature and the judiciary cannot sit as a super-legislature. Skaggs Drug Center, Inc. v. United States Time Corp., 101 Ariz. 392, 420 P.2d 177 (1966); Shaw v. State, supra.

The legislature of the State of Arizona, by enacting statutes regarding abortion, has exercised the inherent power of the state known as the "police power". One of the limitations on the police power of the state to enact legislation for the protection of the safety, health, morals and general welfare of its citizens is that such legislation must bear some reasonable relation to objectives sought to be achieved, and if it does, courts will not substitute their judgment for that of the legislature. State v. A. J. Bayless Markets, Inc., 86 Ariz. 193, 342 P.2d 1088 (1959). It is a corollary of the foregoing that where an act purportedly enacted under the police power shows on its face that it cannot and will not conduce to any legitimate police purpose, it is the court's duty to pronounce it unconstitutional. State v. Borah, 51 Ariz. 318, 76 P.2d 757 (1938). For valid legislation to be enacted pursuant to the police power it must be shown that the legislation seeks to achieve a legitimate legislative end through reasonable means under the circumstances. Campbell v. Su-

perior Court, 106 Ariz. 542, 479 P.2d 685 (1971). *See also* McKinley v. Reilly, 96 Ariz. 176, 393 P.2d 268 (1964).

The measure of reasonableness is that which is fairly appropriate to its purpose under all circumstances and not necessarily what is best. State v. Borah, supra. The possession and enjoyment of all rights are subject to a reasonable exercise of the police power. Gundling v. City of Chicago, 177 U.S. 183, 20 S.Ct. 633, 44 L.Ed. 725 (1900). The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority to be essential to the safety, peace, good order and morals of the community. Crowley v. Christensen, 137 U.S. 86, 11 S.Ct. 13, 34 L.Ed. 620 (1890).

If personal liberties are involved, the court will closely scrutinize the regulations and if there is a significant encroachment upon personal liberty, the state may prevail only upon the showing of a subordinate interest which is compelling. Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). Our task is to apply these foregoing precepts to the statutes in question.

Recent assaults on the abortion laws of the various states have met with varying success. Challenges to the constitutionality of such statutes were sustained in the following cases: People v. Belous, 71 Cal.2d 954, 80 Cal.Rptr. 354, 458 P.2d 194 (1969), cert. denied 397 U.S. 915, 90 S.Ct. 920, 25 L.Ed.2d 96 (1970); Roe v. Wade, 314 F. Supp. 1217 (N.D.Tex.1970); State v. Barquet, 262 So.2d 431 (Fla.1972); Doe v. Scott, 321 F.Supp. 1385 (N.D.Ill.1971); Doe v. Bolton, 319 F.Supp. 1048 (N.D.Ga. 1970); Babbitz v. McCann, 310 F.Supp. 293 (E.D.Wis.1970); State v. Nixon, 42 Mich.App. 332, 201 N.W.2d 635 (1972); Abele v. Markle, 342 F.Supp. 800 (D.C. Conn.1972).[2]

On the other hand, challenges to the abortion laws in other states have been de-

---

2. The cases of Roe v. Wade, Doe v. Scott and Doe v. Bolton are presently pending before the United States Supreme Court.

nied: Steinberg v. Brown, 321 F.Supp. 741 (N.D.Ohio 1970); Corkey v. Edwards, 322 F.Supp. 1248 (W.D.N.C.1971); Spears v. State, 257 So.2d 876 (Miss.1972); Rosen v. Louisiana State Board of Medical Examiners, 318 F.Supp. 1217 (E.D.La.1970); United States v. Vuitch, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971); State v. Abodeely, 179 N.W.2d 347 (Iowa 1970); State v. Munson, 201 N.W.2d 123 (S.D. 1972); Rodgers v. Danforth, 486 S.W.2d 258 (Mo.1972); Thompson v. State, 493 S.W.2d 913 (Ct.Crim.App.Tex.1971); Crossen v. Attorney General of Commonwealth of Kentucky, 344 F.Supp. 587 (E.D.Ky. 1972).

In United States v. Vuitch, supra, the Supreme Court of the United States considered the statute of the District of Columbia which provides in part:

> "Whoever, by means. of any instrument, medicine, drug or other means whatever, procures or produces, or attempts to procure or produce an abortion or miscarriage on any woman, unless the same were done as *necessary for the preservation of the mother's life or health* and under the direction of a competent licensed practitioner of medicine, shall be imprisoned in the penitentiary not less than one year or not more than ten years. . . . " (Emphasis added)

The attack made on the District of Columbia statute was that it was vague, and specifically that the word "health" was vague since one could not know whether the word meant both "mental health" as well as "physical health". The Supreme Court, in rejecting the vagueness contention, held that the word "health" is not so imprecise or uncertain in its meaning that it fails to inform a defendant of the charge against him and that the due process clause of the United States Constitution was not violated. While explicitly holding that the word "health" was not vague, the Court by implication upheld the non-vagueness of the word "life", since the entire statute was under attack as being vague. The Supreme

Court stated that whether a particular operation is necessary for a patient's physical or mental health is a judgment physicians are obviously called upon to make routinely whenever surgery is considered. The Court further noted that under the District of Columbia statute, as under our statute, the burden of proof was on the District of Columbia to prove that the abortion was not necessary for the preservation of the mother's life or health.

We believe the same reasoning applies to the phrase ". . . unless it is necessary to save her life . . ." which appears in our abortion statute. *See* Steinberg v. Brown, supra; Babbitz v. McCann, supra; State v. Abodeely, supra; Rosen v. Louisiana State Board of Medical Examiners, supra; State v. Munson, supra; Rodgers v. Danforth, supra; Thompson v. State, supra, in which the constitutionality of similar statutory language appearing in the abortion laws of Ohio, Wisconsin, Iowa, Louisiana, South Dakota, Texas, Missouri and Kentucky was upheld.

We agree with the holding and observation of the court in Crossen v. Attorney General of Commonwealth of Kentucky, supra:

> "The court is of the opinion that the phrase 'necessary to preserve her life' is not unconstitutionally vague, albeit perhaps technically imprecise. *The phrase means, and is generally understood to mean, that an abortion is unavailable except if it is reasonably certain that a woman's continued pregnancy will result in her death.* The argument of vagueness is, in our judgment, nothing more than a guise for the plaintiff's belief that the statute too rigidly regulates what, under certain conditions, can be a safe and salutary surgical procedure. We agree with the observation of the court in Steinberg v. Brown, 321 F.Supp. 741 (D.C.1970), which in speaking of the alleged vagueness of an Ohio abortion statute, similar to that here under attack, stated: 'The problem of the plain-

tiffs is not that they do not understand (the statute), but that basically they do not accept, its proscriptions.'" (Emphasis added) 344 F.Supp. at 590.

We next turn to the main issue in the case *sub judice*. Both appellants and appellees frame the issue as being whether a fetus is a "person" within the meaning of the Constitutions of the United States and the State of Arizona. We do not believe that we have to decide this issue in order to decide whether the Arizona abortion statutes are a valid exercise of the police power.[3]

Appellees argue that their rights and the rights of women under the Ninth Amendment to the United States Constitution are offended by the Arizona statutes. The springboard for their contention is Griswold v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), in which the Supreme Court held the Connecticut law forbidding the use of contraceptives an impermissible intrusion upon the constitutionally protected peripheral or penumbral right of marital privacy.

The *Griswold* doctrine was recently extended in Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) by declaring a Massachusetts statute which permitted married persons to obtain contraceptives but denied the same right to single persons to be invalid as a violation of the equal protection clause of the Fourteenth Amendment. The Court in *Eisenstadt* said that if the right of privacy means anything, "it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."

All the courts which have declared the abortion statutes unconstitutional have done so by starting with the *Griswold* decision as a jumping-off point. Thus, in Doe v. Scott, supra, in which the Illinois abor-

tion statute was determined to be unconstitutional, the court said:

"We cannot distinguish the interests asserted by the plaintiffs in this case from those asserted in *Griswold*. In both, '[t]he essence of the interest sought to be protected * * * is the right of choice over events which, by their character and consequences, bear in a fundamental manner on the privacy of individuals.' [footnote omitted] It is as true after conception as before that 'there is no topic more closely interwoven with the intimacy of the home and marriage than that which relates to the conception and bearing of progeny.' [footnote omitted] We believe that *Griswold* and related cases establish that matters pertaining to procreation, as well as to marriage, the family, and sex are surrounded by a zone of privacy which protects activities concerning such matters from unjustified governmental intrusion. [footnote omitted]

We do not agree with the defendants that the choice whether to have a child is protected before conception but is not so protected immediately after conception has occurred. [footnote omitted] A woman's interest in privacy and in control over her body is just as seriously interfered with by a law which prohibits abortions as it is by a law which prohibits the use of contraceptives. The majority of courts which have considered the question have so held, concluding that a woman has a fundamental interest in choosing to terminate a pregnancy. In People v. Belous, supra, the California Supreme Court struck down that state's abortion statute, holding:

The fundamental right of the woman to choose whether to bear children follows from the Supreme Court's and this court's repeated acknowledgment of a 'right of privacy' or 'liberty' in

---

3. A substantial case can be made for holding the fetus is a "person" within the due process clause of the Fourteenth Amendment. See "The Unborn Child and the Constitutional Conception of Life", 56 Iowa L.Rev. 994 (1971); Kutner, "Due Process of Abortion", 53 Minnesota Law Review 1 (1968); Noonan, "The Constitutionality of the Regulation of Abortion", 21 Hastings L.J. 51 (1969).

*matters related to marriage, family, and sex.* [footnote omitted]

Moreover, a statute which forces the birth of every fetus, no matter how defective or how intensely unwanted by its future parents, displays no legitimately compelling state interest in fetal life, especially when viewed with regard for the countervailing rights of pregnant women. We do not believe that the state has a compelling interest in preserving all fetal life which justifies the gross intrusion on a woman's privacy which is involved in forcing her to bear an unwanted child. We therefore rule that during the early stages of pregnancy—at least during the first trimester—the state may not prohibit, restrict or otherwise limit women's access to abortion procedures performed by licensed physicians operating in licensed facilities."

We do not believe the reasoning in Doe v. Scott, supra, and People v. Belous, supra, is persuasive. Nor do we believe that Griswold v. Connecticut, supra, constitutes authority for the holding in those cases that there is no fundamental difference between a right to use contraceptives and a right to terminate a pregnancy.

Although there is a private realm of family life which the court may not enter, Griswold v. Connecticut, supra, one cannot seriously argue that parents are thereby free to abuse and neglect their children free of state control. One cannot gainsay a legislative determination that an embryonic or fetal organism is "life." Once begun, the inevitable result is a human being, barring prior termination of the pregnancy. Rhetorically, one may ask: Does the fundamental right to privacy as enunciated in *Griswold* and *Eisenstadt* include a fundamental right to destroy life? We do not think so. We agree with those cases which have refused to invalidate the abortion laws. In Steinberg v. Brown, supra, the court stated:

\* \* \* \* \* \*

"The second contention of the plaintiffs and those *amicus curiae* who sup-

port their position is that Ohio abortion statute deprives them of the right of privacy which is supposedly protected by several amendments to the Constitution of the United States. The arguments and authorities cited go on at inordinate length, but when the meringue is sluiced away, they come down to the contention that the decision of the Supreme Court in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), which recognized the right of marital privacy by voiding a statute preventing dissemination of contraceptive information and devices, must by extension protect the right to destroy the product of conception after it has taken place.

\* \* \* \* \* \*

. . . The plaintiffs' contentions seek to extend far beyond the holding in the *Griswold* case this 'right of privacy', which is nowhere expressly mentioned in the Constitution or its amendments, but is only found in the 'penumbra' of those articles. Rights, the provision of which is only implied or deduced, must inevitably fall in conflict with the express provisions of the Fifth and Fourteenth Amendments that no person shall be deprived of life without due process of law. The difference between this case and *Griswold* is clearly apparent, for here there is an embryo or fetus incapable of protecting itself. There, the only lives were those of two competent adults.

Without going into all of the myriad of cases and texts that deal with various aspects of this problem, the question resolves itself into whether or not the state has a legitimate interest to legislate for the purpose of affording an embryonic or fetal organism an opportunity to survive. We think it has and on balance it is superior to the claimed right of a pregnant woman or anyone else to destroy the fetus except when necessary to preserve her own life.

\* \* \* \* \* \*

. . . The right and power of a man or a woman to determine whether or not to participate in this process of creation

is clearly a private and personal one with which the law cannot and should not interfere.

It seems clear, however, that the legal conclusions in *Griswold* as to the rights of individuals to determine without governmental interference whether or not to enter into the processes of procreation cannot be extended to cover those situations wherein, voluntarily or involuntarily, the preliminaries have ended, and a new life has begun. Once human life has commenced, the constitutional protections found in the Fifth and Fourteenth Amendments impose upon the state the duty of safeguarding it."

\*   \*   \*   \*   \*   \*

In upholding North Carolina's abortion statutes in Corkey v. Edwards, supra, the Court stated:

"We deal in this case, however, not merely with whether a woman has a generalized right to choose whether to bear children, but instead with the more complicated question whether a pregnant woman has the right to cause the abortion of the embryo or fetus she carries in her womb. We do not find that an equation of the generalized right of the woman to determine whether she shall bear children with the asserted right to abort an embryo or fetus is compelled by fact or logic. Exercise of the right to an abortion on request is not essential to an effective exercise of the right not to bear a child, if a child for whatever reason is not wanted.

\*   \*   \*   \*   \*   \*

To determine the state interest we shall not attempt to choose between extreme positions. Whether possessing a soul from the moment of conception or mere protoplasm, the fertilized egg is, we think, 'unique as a physical entity,' Lucas, Federal Constitutional Limitations of the Enforcement and Administration of State Abortion Statutes, 46 N.C.L.Rev. 730, 744 (1968), with the potential to become a person. Whatever that entity is, the state has chosen to pro-

tect its very existence. The state's power to protect children is a well established constitutional maxim. See, Shelton v. Tucker, 364 U.S. 479, 485, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Prince v. Massachusetts, 321 U.S. 158, at 166–168, 64 S.Ct. 438, 88 L.Ed. 645. That this power should be used to protect a fertilized egg or embryo or fetus during the period of gestation embodies no logical infirmity, but would seemingly fall within the 'plenary power of government.' Poe v. Ullman, 367 U.S. 497, at 539, 81 S.Ct. 1752, 6 L.Ed.2d 989 (Harlan, J., dissenting). That there is a state interest has until recently been taken for granted. History sides with the state. [footnote omitted]"

We do not find the Arizona statute overbroad because it does not make exceptions for cases of rape or a defective fetus. Admitting that the subject of abortion is within the police power of the state and finding that there is no fundamental right to destroy life, the test of validity in this case is whether or not the ends sought to be attained are appropriate and the regulations presented are reasonable. Edwards v. State Board of Barber Examiners, 72 Ariz. 108, 231 P.2d 450 (1951). The measure of reasonableness is what is fairly appropriate to its purpose under all circumstances and not necessarily what is best. State v. Borah, supra.

We realize that pregnancy is a crisis in the life of a woman, bringing about a special interaction of mind, body, self and society. The legislature has balanced the interest of the mother against the interest of the fetus and has opted in favor of the fetus. We are unable to say that the legislature's decision is unreasonable. As for the defective fetus we ask, how "defective" is "defective"? Is the defect capable of being corrected? The argument in favor of aborting the defective fetus assumes that handicapped life is not worth living. We believe the legislature can legitimately decide that the primary consideration is the protection of life, even abnormal.

It is therefore within the province of the state legislature to weigh the competing interests and enact, as the legislature has done in this state, a statute which prohibits all abortions except those necessary to save the life of the mother. Appellees' claimed infringement of rights to conduct family planning, choice of medical treatment and freedom to follow the dictates of their professional conscience must fall in the face of this valid exercise of the police power.

We find appellees' argument that the statutes constitute an establishment of religion and violate their religious liberty is without merit. A great many of the statutes found in our criminal code have their roots in Judeo-Christian ethics. It would be absurd to claim that our statutes against larceny are an unconstitutional establishment of religion since "Thou shalt not steal" is contained in the Decalogue. One need not base a sanctity for life on only religious concepts. Its basis can be found in a deeper protoreligious "natural metaphysic" the chief feature of which is the affirmation that life is sacred not because of the existence of God but because of the very fact that it is life. This idea of "sacredness" is generated by the primordial experience of being alive, of experiencing the elemental sensation of vitality and the elemental fear of its extinction. *See* Edward Shils "The Sanctity of Life" in "Life or Death, Ethics and Options." (Seattle University, Washington Press, 1968) pages 12, 14–15, 18.

Finally, appellees contend that the statutes discriminate against poor women because women with sufficient means are always free to travel outside the state and procure a legal abortion. This contention was repudiated in both Steinberg v. Brown, supra, and Crossen v. Attorney General of the Commonwealth of Kentucky, supra. We adopt the following language from *Crossen*:

"We know of no case where it has been successfully argued that there is an absolute constitutional right to abortion. The fact that a woman may have a constitutional right to privately decide whether to submit to an abortion does not mean that she has a constitutional right to require the State to perform the abortion. Simply, and perhaps somewhat callously put, a poor woman may not be able to afford an abortion even though the State might guarantee her the right to decide to have one. The plaintiffs' argument is admittedly poignant, but we cannot say that it merits a constitutional invalidation of the statute. See Steinberg v. Brown, supra, where the court noted that the problems caused by the disparity between certain women's economic status was not caused by the wording of the statute."

In conclusion, we are unable to find that appellees have sustained their burden of overcoming the presumption in favor of constitutionality. After every intendment has been indulged by us in favor of the validity of the statute we are also not satisfied beyond a reasonable doubt that the statutes are unconstitutional.

Appellees' complaints against the abortion statutes are peculiarly within the field occupied by the legislature and any problem concerning abortion should be solved by that body. We can only reiterate that we are not a super-legislature.

In view of our disposition of this case we need not decide the cross-appeal. The judgment of the trial court is reversed, the case is remanded and the trial court is ordered to enter a judgment in favor of appellants and against appellees denying injunctive relief and upholding the constitutionality of the statutes.

HATHAWAY, J., concurs.

KRUCKER, Chief Judge (dissenting).

I am unable to agree with the majority of this court as to the constitutionality of the subject statutes and would sustain the lower court's determination that these statutes suffer from "overbreadth". I am in accord with their rejection of the "vague-

ness" and "equal protection" arguments advanced by appellees in their assault on the abortion statutes and also with the basic principle that the judiciary should zealously respect the doctrine of separation of powers and be loath to interfere in matters committed to legislative wisdom.

My colleagues recognize, however, that close judicial scrutiny is warranted in the area of personal liberty and that legislative encroachment thereon can be sustained only if a compelling interest exists. The majority opinion focuses upon the nature of the interests of the State in protecting fetal life reflected in the statutes. Assuming that the abortion statutes are attempts to balance the rights of the fetus against the rights of the woman, the balance struck by the State cannot be supported on the basis of "compelling interest."

In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the United States Supreme Court held that the decision to use contraceptive devices is an aspect of a relationship lying within a penumbral zone of privacy created by several fundamental constitutional guarantees, and that a state law forbidding the use of such devices unduly invades that area of protected freedom with maximum destructive effect upon that relationship. In Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), that Court once again denounced governmental intrusion into the private realm of family life. My colleagues indulge in a very narrow construction of the principles enunciated in these cases. To me, these cases clearly identify the right urged here on behalf of pregnant women, i. e., the power to determine whether or not she wishes to bear a child.

Our abortion statutes force a woman to carry to term a pregnancy that is the result of rape or incest. They require a woman to carry to natural term a fetus likely to be born a mental or physical cripple. Once she is pregnant, she is required to hazard the risk of pregnancy and delivery no matter what the degree of risk to her own health might be. The State has foisted these burdens upon her, under the guise of its police power, but affords her no remedy or recognition of her needs, physical or mental. I concede that the Ninth Amendment right to choose to have an abortion is not unqualified or unfettered, but legislative limitations of such right must pass the test of "compelling State interest." I agree with the rationale of Doe v. Scott, 321 F.Supp. 1385 (N.D.Ill. E.D.1971) in that I find no compelling state interest to justify requiring a woman to risk physical and emotional harm short of death or to carry a child begotten by rape or to require her to carry a fetus likely to be born a mental or physical cripple. A woman's interest in terminating a pregnancy under these circumstances far outweighs any state interest in the birth of such a child. Denial of therapeutic abortions in these instances, so far as I am concerned, is an overreaching of the police power. Since our abortion statutes intrude into areas in which the State's interest is minimal, they cannot withstand the assault on their constitutionality.

In coming to this conclusion, however, it is not my intention to give judicial sanction to abortion upon demand.[1] I would

---

1. Four states now allow abortion upon a woman's request. *See,* 11 Alas.Stat. § 11.15.060; Hawaii Stat. tit. 25 § 453–16; New York Penal Law, McKinney's Consol.Laws c. 40 § 125.05 (1971 Supp.); Wash.Rev.Code Ann. § 9.02.060 (1971 Supp.). Eleven states allow abortion if the pregnancy presents a danger to the physical or mental health of the mother or is the result of rape or incest. *See,* 41 Ark.Stat. § 304; Colorado 1971 Session Laws, art. 6 § 40–6–101; 24 Del. Code Ann. § 1790; 26 Ga.Code Ann. § 9925a (1971 Supp.); 21 Kan.Stat.Ann. § 3407 (1971 Supp.); 43 Md.Code Ann. § 137 (1971 Supp.); N.M.Stat. 40A–5–1 (1971 Supp.); N.C.Gen.Stat. § 14–45.1 (1971 Supp.); Or.Rev.Stat. § 435.415; S.C.Code Ann. § 16–87 (1971 Supp.); Va.Code 18.1–62.1 (1971 Supp.). California enacted a like statute, California Health & Safety Code §§ 25950–25955 (West Supp.1971). However, in a decision rendered on November 22, 1972, in

hold that our statutes are unconstitutional because they impermissibly and unduly invade and restrict women's right to privacy and basic liberty as guaranteed by the due process clause of the Fourteenth Amendment. Although the matter of abortion is an appropriate area for legislative action, I cannot approve legislation which impinges upon such right to a degree beyond justification.

## OPINION ON REHEARING

HOWARD, Judge.

Since our original opinion in this case and during the period for rehearing the United States Supreme Court has decided the cases of Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) and Roe v. Wade, 410 U.S. 113, 93 S.Ct.

the case of People v. Barksdale, 8 Cal. 3d 320, 105 Cal.Rptr. 1, 503 P.2d 257, the California Supreme Court invalidated the

705, 35 L.Ed.2d 147 (1973). Accordingly, the motion for rehearing is granted and our former opinion is vacated.

In the foregoing cases, the United States Supreme Court held that abortion statutes similar to those of the State of Arizona are unconstitutional.

We are bound by the United States Supreme Court's interpretation of the United States Constitution. A.R.S. §§ 13–211 through 13–213 are unconstitutional.

The decision of the trial court is affirmed except that part of the decision limiting the effect of the decision to the parties only is modified in that the statutes in question are unconstitutional as to all.

HATHAWAY, C. J., and KRUCKER, J., concur.

entire Therapeutic Abortion Act on the ground that §§ 25951 and 25954 were void for vagueness.